Argued September 9, affirmed in part; reversed in part
December 18, 1968, petition for rehearing denied
January 21, 1969

GROCE, *Respondent and cross-appellant,* v.
FIDELITY GENERAL INSURANCE
COMPANY, *Appellant and cross-
respondent.*

BOWER, *Respondent and cross-appellant,* v.
FIDELITY GENERAL INSURANCE
COMPANY, *Appellant and cross-
respondent.*
448 P. 2d 554

298

*Howard R. Feuerstein* and *George H. Fraser,* Portland, argued the cause for appellant and cross-respondent. With them on the briefs were Davies, Biggs, Strayer, Stoel and Boley, Portland.

*John R. Faust, Jr.,* Portland, argued the cause for respondents and cross-appellants. With him on the brief were Cake, Jaureguy, Hardy, Buttler & McEwen, and Pozzi, Levin & Wilson, Portland.

Before PERRY, Chief Justice, and SLOAN, GOODWIN, HOLMAN and LUSK, Justices.

## GOODWIN, J.

Fidelity General Insurance Company, the defendant in these consolidated cases, challenges judgments entered upon verdicts in favor of two plaintiffs who brought actions as assignees of the defendant's named insured. The plaintiffs previously had recovered judgments against the insured for damages in excess of his policy limits. There is also a cross appeal seeking attorney fees.

The seven assignments of error on appeal present questions that will be discussed under two general subjects: (1) the assignability of the insured's cause of action against his insurer for failure to act in good faith to settle damage claims within policy limits, and (2) alleged errors in the trial of these particular cases.

The facts, insofar as they are material to these appeals, are not in controversy. One Stayton, the defendant's insured, while turning a pickup truck illegally across traffic, collided with a Volkswagen, killing one occupant and injuring another. Stayton's insurance policy provided the minimum coverage then required by Oregon's financial responsibility law: $5,000 damages per person killed or injured, and $10,000 damages for any one accident. Stayton, who is shown by the record to have been unemployed at all material times, had recently taken bankruptcy for the second time.

Plaintiffs, after perfunctory conversations with the adjuster assigned to the case, caused a letter to be directed to the defendant demanding that it pay the full amount of the policy limits in settlement of the two cases or prepare to defend itself in an action for excess liability based upon its failure to exercise good faith in reaching settlement.

During the next several months the plaintiffs and the adjuster continued inconclusive maneuvering. There was no attempt by the defendant to involve Stayton in these or any other settlement discussions. On October 17, 1963, an attorney for the plaintiffs wrote the defendant a letter demanding payment of $10,000 by November 1; this letter was never directly answered. On November 11, however, the defendant's adjuster asked the plaintiffs' attorney whether he would accept $9,500, and the attorney said he would take it up with his clients. There is evidence that the plaintiffs' attorney had already resolved not to recommend settlement for less than the full $10,000. On December 3, the defendant made an offer to settle for $9,500, and the offer was rejected.

Damage actions were filed on January 9, 1964. After the two actions were filed, and while the litigation was pending, the defendant finally offered, in writing, to settle both cases for $10,000. This offer was rejected. The $10,000 offer was renewed and rejected from time to time during the litigation, but the plaintiffs remained firm in their decision to see the litigation through to final judgment and then to proceed against the defendant for any damages that might be recoverable in excess of the policy limits. Pursuant to this decision, the plaintiffs asked Stayton to assign to them any causes of action he might have against his insurance company.

The actions resulted in judgments of $25,000 in the death case and $48,830.98 in the injuries case. After the entry of the judgments the plaintiffs obtained written assignments from Stayton of his cause of action against the defendant for wrongful failure to settle. The consideration given for the assignments was the agreement of the plaintiffs to satisfy their judgments against Stayton if any recovery was had upon the actions against the insurer. Meanwhile, the defendant paid the policy limits in partial satisfaction of the judgments against Stayton.

## I. ASSIGNABILITY

The arguments for and against the assignability of bad-faith claims against insurance companies are found in the decisions collected in the Annotation, 12 ALR3d 1158 (1967). In some jurisdictions, assignability appears to turn upon local statutory or decisional rules concerning the assignability of causes of action generally. In Oregon, we are free to adopt the rule that commends itself to us as the most reasonable.

We believe that the reasoning in *Radcliffe v. Franklin Nat'l Ins. Co.*, 208 Or 1, 298 P2d 1002 (1956), is instructive. The right to expect one's insurer to exercise good faith in the settlement of claims is a valuable contract right. The insurer reserves absolute control over negotiation and litigation. The insurer owes a duty to exercise this control in good faith to protect the insured. See cases collected in the Annotation, 40 ALR2d 168 (1955). Even if the insurer's breach of its reciprocal obligation of good faith may be said for certain purposes to be tortious, the cause of action arising from such breach is one that affects the insured in his property, as distinguished from his person, and so ought to be as capable of assignment

and survival as any other contract right. *Gray, Aplnt. v. Nationwide Mut. Ins. Co.*, 422 Pa 500, 223 A2d 8 (1966); *Brown v. Guarantee Ins. Co.*, 155 Cal App 2d 679, 319 P2d 69, 66 ALR2d 1202 (1957).

The defendant advances a number of arguments for the proposition that even if an insured might, under some circumstances, have an assignable cause of action against an insurer for wrongful refusal to settle, the facts in the case at bar militate against assignment.

The first of the defendant's arguments is that the plaintiffs in these cases "set up" the defendant with the purpose of obtaining from the defendant a far greater recovery than the defendant's contractual engagements would provide. Defendant says the plaintiffs refused to disclose the name of an important witness they had discovered, and by other means led the defendant into a trap by refusing to settle. The defendant says that although the plaintiffs made up their minds at an early stage in negotiation not to settle for less than the full amount of the policy, the plaintiffs led the defendant to believe a settlement at a lower figure was possible. The plaintiffs deny that they ever suggested that they would settle for less than the full amount of the policy limits.

The attorneys who represented the plaintiffs did so with skill and fidelity to their clients' interests. The record reveals that once the defendant's attorneys came into the litigation the defendant was equally well protected. However, long before the cases were filed, the agents of the defendant knew that the damage claims were not the kind that would, if tried, be likely to result in verdicts within the insurance limits. Notwithstanding the high probability of verdicts far in excess of policy limits, there is no evidence that the

defendant ever consulted the insured or considered any interest he might have had in avoiding judgments in excess of his insurance coverage. On the contrary, affirmative evidence showed that the defendant, at least through the mouth of its adjuster, reflected an arrogant disdain for the rights of its bankrupt insured, and was willing to use the insured's insolvency as additional leverage in an attempt to settle the claims for less than the meager limits of the policy. The adjuster, who had learned from his own investigation that the insured was intoxicated at the time of the accident and who knew that there was virtually no defense on the issue of fault, wrote to his superiors, "In this adjuster's experience, he has never paid a policy limit to date, and does not intend to start with the subject claim."

■ Arguments suggesting that assignability in these cases will foster collusion and militate against settlements are unconvincing. All an insurance company need do to avoid the evils of collusion is to exercise good faith with reference to the rights of its insured. *General Accident Fire & Life Assur. Corp. v. Little,* 103 Ariz 435, 443 P2d 690 (1968). As far as the encouraging or discouraging of settlements is concerned, it may not be unreasonable to suggest that insurers might prefer to avoid results of the kind appealed from in the cases at bar.

■■ To the argument that the assignment of claims in cases of this kind breeds champerty and maintenance, it is sufficient to observe that for many years at common law the bona fide assignee of a chose in action has not been deemed guilty of champerty. Champerty is the intermeddling of a stranger in the litigation of another, for profit, and maintenance is the financing of such intermeddling. See 14 Am Jur 2d 848,

Champerty and Maintenance § 10 (1964). A judgment creditor of an insolvent tortfeasor can hardly be called an intermeddling stranger to litigation necessary to pay his judgment.

■ The defendant also argues that the assignments in the case at bar were defective because each was only a partial assignment of a single cause of action. The defendant correctly states that its insured, Stayton, had one cause of action for the wrongful refusal of the defendant to settle the two related claims against him within the policy limits. The assignment of that one cause of action to two separate plaintiffs did result in each of them pursuing an independent action against the defendant. This bifurcation of the insured's cause of action obviously violated the rule against the splitting of causes of action. *Wood et ux v. Baker et ux,* 217 Or 279, 284, 341 P2d 134 (1959).

■ We need not decide, however, whether the trial court in these cases might have committed error in treating the two plaintiffs as if they were joint owners of a single cause of action. The question does not appear to have been presented to the trial court during the pleading stage of this litigation. Error is not ordinarily ascribed to a court's failure to rule upon a question that was not presented at the appropriate time.

■ The first time anyone knew that the defendant objected to the splitting of a cause of action in these cases was after the plaintiffs had rested their cases. The point was mentioned for the first time in a motion for a nonsuit. The proper time to raise such an objection is during the pleading stage. We conclude, therefore, that the objection, regardless of its abstract validity, was not timely, and when finally made was a mere formality. See, for a discussion of the kind

of procedures that could have been employed to prevent either prejudice or multiplicity of actions if a timely objection had been made, Clark, Code Pleading § 23, at 170-171 (2d ed 1947).

 (The defendant had interposed timely demurrers to the complaints on the grounds in each case that there was a defect of parties, as well as the usual grounds that each complaint did not state a cause of action. The alleged defect of parties was asserted to lie in the failure to join the assignor, Stayton, who was said to be the real party in interest. These demurrers were consistent with the defendant's contention throughout the litigation that the assignments were void and that Stayton, the insured, was the only party who could bring an action against the insured for a wrongful refusal to settle. As noted above, we have held the law to be otherwise. Therefore, the defendant's demurrers were based upon invalid grounds. In no event could the demurrers be said to have presented the trial court with a timely request for a ruling on the splitting of the cause of action. There was a defect of parties in each case, but the defect in each consisted in the failure to join the other partial assignee. Since the two cases were combined for trial, with the consent of the defendant, it is obvious that these defects were of form only, and not of substance, and that they caused no prejudice to the defendant.)

██ The policy contained a provision that "[a]ssignment of interest under this policy shall not bind the company until its consent is endorsed hereon * * *." But the contention that such a clause prohibits the insured from assigning his cause of action need not detain us. It is well settled that such a provision does not preclude the assignment of a cause of action for damages for breach of a contract. *Commnale*

*v. Traders & General Ins. Co.,* 50 Cal 2d 654, 661-
662, 328 P2d 198, 202, 68 ALR2d 883 (1958). See also
*Critz v. Farmers Ins. Group,* 230 Cal App 2d 788, 803,
41 Cal Rptr 401, 409-410, 12 ALR3d 1142 (1965).

## II. ERRORS ASSIGNED TO TRIAL
## RULINGS

 The defendant asserts that the court erred
in allowing an expert witness, in answer to a hypo-
thetical question, to give his opinion on the good faith
of the insurer. The plaintiffs had called as an expert
an attorney experienced in representing insurance
companies in damage cases. The defendant's only
ground for objection at the time the testimony was
offered was that the question was irrelevant and im-
material. An objecting party who has made only a gen-
eral objection cannot upon appeal assert for the first
time a specific ground of objection. *State v. Von Klein,*
71 Or 159, 142 P2d 549 (1914). This is not a case
in which we can say that it is apparent from the
record that the trial judge must have discerned the
ground of objection. See *Peters v. Consolidated
Freight Lines,* 157 Or 605, 613-614, 73 P2d 713 (1937).
Accordingly, we decline to make an exception to the
rule stated in *State v. Von Klein,* supra. The court
correctly overruled the objection on the grounds speci-
fied in the objection. The expert's testimony was both
relevant and material.

Rule 4 of the Uniform Rules of Evidence states a
commendable policy:

"A verdict or finding shall not be set aside, nor
shall the judgment or decision based thereon be re-
versed, by reason of the erroneous admission of
evidence unless (a) there appears of record objec-
tion to the evidence timely interposed and so stated

as to make clear the specific ground of objection, and (b) the court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and probably had a substantial influence in bringing about the verdict or finding."

Assignment of error No. 5 alleges that error was committed in not giving defendant's requested instruction No. XXVB:

"You are not to consider the opinion of experts based upon hypothetical facts as to whether defendant acted in bad faith for the reason that that determination is solely within your province."

The defendant excepted to the failure so to instruct, on the ground that the question of good or bad faith was the ultimate question for the jury, and on the ground that the expert testimony had been an invasion of the jury's province. In this court, the defendant argues that (1) since good or bad faith is a technical, legal standard, and was not adequately defined, the answer of the witness constituted an opinion of mixed law and fact; and (2) the question of the defendant's bad faith involved a standard which the jury could have applied without direct expert testimony.

In Oregon, expert testimony is not objectionable merely because it constitutes an opinion upon an ultimate fact or "invades the province of the jury." *Ritter v. Beals et al*, 225 Or 504, 524-525, 358 P2d 1080 (1961); *Schweiger v. Solbeck*, 191 Or 454, 472-473, 230 P2d 195, 29 ALR2d 435 (1951). But the defendant contends that a question which calls for an opinion on an ultimate issue and, at the same time, requires the application of an undefined legal standard is not permissible.

■ It is questionable just how undefined "good faith" or "bad faith" may be. See *Radcliffe v. Franklin Nat'l Ins. Co.*, 208 Or at 39. Juries are capable of making the distinction. See *General Accident Fire and Life Assur. v. Little*, supra.

■■ Assuming, however, that the expert's testimony may have been objectionable on the grounds that some terms were left undefined, an adequate remedy was available during direct examination. If a party thinks an undefined term is likely to hurt him, his recourse is to request leave during direct examination to ask a question in aid of objection. He can ask that the opposing attorney define the questionable or misleading or undefined terms. McCormick, Evidence § 12, at 27-28 (1954).

■■ If the undefined term is not defined during direct examination, the adversary has another opportunity on cross-examination. In *Malila v. Meacham*, 187 Or 330, 336-337, 211 P2d 747 (1949), we faced a similar problem in a malpractice case involving the terms "proper" and "improper." We said that if the opposing party had any doubt as to the meaning of the words, clarification could have been obtained upon cross-examination. We hold that the requested instruction was properly denied. There was little or no danger that the jury would not understand the meaning of "good" or "bad" faith.

■ The fact that the jury did not necessarily need the expert testimony did not render the testimony inadmissible. The testimony was at least useful, if not indispensable. It can hardly be said that the average juror was as well equipped as an experienced insurance defense attorney to judge the good or bad faith of an insurer, based upon the facts included within the hypothetical question.

We are unwilling to adopt the defendant's protestation that expert testimony in these cases was a one-sided advantage. The defendant was free to use expert testimony, and it was not the plaintiffs' fault if no expert could be found who would testify in answer to the hypothetical question that good faith was employed in protecting the rights of the insured.

Two assignments of error assert that the damages should have been limited to one dollar, or such other amount which, by compromise or otherwise, would have released the insured from any liability to the plaintiffs on the excess judgments. The trial court had refused a defense instruction limiting damages to $1.00. The court gave a plaintiffs' instruction telling the jury that the plaintiffs could recover up to the amount of their total unpaid judgments.

■ Since any amount of recovery literally would have released the insured under the terms of the assignments, the defendant argues that the insured had mitigated his damage through his assignment and that the plaintiffs should be permitted to recover no more than the minimum that would release the insured. If the assignments had been worded differently, this problem could have been avoided.

We believe, however, that the intent of each assignment is clear. The effect of following the defendant's argument would be to defeat the purpose of these assignments. An injured plaintiff would be reluctant to accept an assignment unless it provided that the insured would be released only upon *full* recovery from the insurer. And, if the insured could assign only on those terms, he might feel compelled to bring the litigation himself in order to see that his interests were properly protected. The result for the insurer would be the same, but the insured and the plaintiff

would be remitted to what the Pennsylvania court aptly called a "needlessly complicated and unjust procedure." *Gray v. Nationwide Mut. Ins. Co.*, 422 Pa at 511, n. 7, 223 A2d at 13, n. 7.

## III. CROSS APPEAL

▆ The plaintiffs, by cross appeal, have challenged a ruling which denied their request for attorney fees in these actions. The trial court held that the actions were not "upon any policy of insurance" within the meaning of ORS 736.325① (now ORS 743.114, as amended, Oregon Laws 1967, ch 359, § 371). The statute no doubt was drawn in contemplation of the type of claim ordinarily made by means of a "proof of loss" form and for one reason or another denied by the insurer. The language of the statute, however, is broad enough to permit recovery of attorney fees in a case of the type we have here.

▆▆ The remedial nature of the statute is clear, and the legislative intent would be served by allowing attorney fees. The allowance of such fees would be consistent with our decision in *Radcliffe v. Franklin National Ins. Co.*, supra. The duty owed by an insurer to its insured to use good faith in seeking to settle litigation within policy limits is a duty that arises

---

① ORS 736.325 "(1) If settlement is not made within six months from the date proof of loss is filed with an insurance company * * *, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such suit or action, then the plaintiff, in addition to the amount that he may recover, shall be allowed and shall recover as part of his judgment such sum as the court or jury may adjudge to be reasonable as attorney's fees.

"(2) If attorney fees are allowed as herein provided and on appeal to the Supreme Court by the defendant the judgment is affirmed, the Supreme Court shall allow to the respondent such additional sum as the court shall adjudge reasonable as attorney fees of the respondent on such appeal."

out of the contract of insurance. Some courts say that the duty arises out of the relation of the parties rather than from any specific provision of the policy. Other courts find within the reservation-of-rights provision of the typical liability policy a covenant by the insurer to protect the insured by settlement in exchange for the surrender of the insured's control over the negotiations and litigation. The cases are collected and discussed in Robert E. Keeton, *Liability Insurance and Responsibility for Settlement*, 67 Harv L Rev 1136 (1954). We believe the better view is that the rights of the parties in these cases are contractual, and that it is consistent with the purposes of ORS 743.114 to allow attorney fees in this case. If attorney fees were not allowed, the insured, or his assignees, would not be made whole. See, construing a comparable Florida statute so as to allow fees in a similar case, *American Fidelity & Casualty Co. v. Greyhound Corp.*, 258 F2d 709, 718 (5th Cir 1958).

◼ Since the allegations relating to attorney fees were stricken during the pleading stage of this litigation, there has been no factual determination by a trial court with reference to the amount to be allowed. Accordingly, these cases must be remanded to the trial court for the purpose of adding to each judgment a reasonable amount as attorney fees in that court. A fee of $2,500 will be allowed pursuant to ORS 743.114 (2) for services performed in this court. The case is one of first impression in this court and the difficulties in preparing briefs and argument were considerable.

The basic judgments are affirmed, but the cases are remanded to the trial court for modification of each by the addition of attorney fees.

Affirmed in part; reversed in part.