No. 46 November 19, 2015 223

IN THE SUPREME COURT OF THE
STATE OF OREGON

BROWNSTONE HOMES
CONDOMINIUM ASSOCIATION,
an Oregon non-profit corporation,
*Petitioner on Review,*

*v.*

BROWNSTONE FOREST HEIGHTS, LLC,
an Oregon limited liability company, et al,
*Defendants,*
*and*

CAPITOL SPECIALTY INSURANCE, CO.
*Respondent on Review.*

(CC 0606-06804; CA A145740; SC S061273)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 11, 2014.

Wendy M. Margolis, Cosgrave, Vergeer, Kester, LLP, Portland, argued the cause and filed the briefs for petitioner on review. With her on the briefs was Thomas W. Brown.

Brian C. Hickman, Gordon & Polscer, LLC, Portland, argued the cause and filed the briefs for respondent on review. With him on the briefs was Gregory A. Baird.

Travis Eiva, The Corson & Johnson Law Firm, Eugene, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

LANDAU, J.

The judgment of the circuit court and the decision of the Court of Appeals are reversed, and the case is remanded to the circuit court for further proceedings.

_____
* Appeal from Multnomah County Circuit Court, Peter R. Chamberlain, Judge pro tempore. 255 Or App 390, 298 P3d 1228 (2013).

**LANDAU, J.**

This is a construction defect case in which a condominium homeowners association sued a contractor for negligence. The contractor's insurer refused to defend the contractor against the action, and the contractor and the homeowners association thereafter entered into a settlement that included a stipulated judgment against the contractor, a covenant by the homeowners association not to execute that judgment, and an assignment to the homeowners association of the contractor's claims against its insurer. When the homeowners association then initiated a garnishment action against the insurer, however, the trial court dismissed the action on the ground that, under *Stubblefield v. St. Paul Fire & Marine*, 267 Or 397, 517 P2d 262 (1973), the covenant not to execute had released the contractor from any obligation to pay the homeowners association and, in the process, necessarily released the insurer as well. The homeowners association appealed, arguing that *Stubblefield* either is distinguishable on its facts or has been superseded by statute. In the alternative, it argued that *Stubblefield* was wrongly decided and should be overruled. The Court of Appeals affirmed. *Brownstone Homes Condo. Assn. v. Brownstone Forest Hts.*, 255 Or App 390, 401, 298 P3d 1228 (2013). For the reasons that follow, we conclude that, although *Stubblefield* is not distinguishable and has not been superseded by statute, it was wrongly decided. We therefore reverse and remand for further proceedings.

## I.  FACTS

The relevant facts are largely those set out in *A&T Siding, Inc. v. Capitol Specialty Ins. Corp.*, 358 Or 32, ___ P3d ___ (2015), a related case recently decided by this court on a certified question from the United States Court of Appeals for the Ninth Circuit.[1] The Brownstone Homes

---

[1] In *A&T Siding*, this court was asked about the legal effect of an addendum to the settlement agreement at issue in this case, which addendum plaintiff and A&T executed while this case was pending before the Court of Appeals. 358 Or at 37-40 (describing addendum and argument about its legal effect). That addendum to the settlement agreement also was the basis for a motion to dismiss, brought by Capitol in this case on the theory that it had rendered the present case moot. We denied that motion in *Brownstone Homes Condo. Assn. v. Brownstone Forest Hts.*, 358 Or 26, ___ P3d ___ (2015). The addendum to the settlement agreement

Condominium Association discovered various defects in the construction of its condominium complex and initiated a negligence action against, among others, A&T Siding, one of the subcontractors on the project. A&T had purchased liability coverage from two different insurers, Capitol Specialty Insurance Co. and Zurich Insurance, and it tendered its defense in the matter to both companies. A&T's policy with Capitol provided coverage for, among other things, "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage.'" Although both Capitol and Zurich initially undertook the defense of the action, Capitol later concluded that the policy it had issued to A&T did not cover the damage for which Brownstone sought recovery, so it declined to defend or indemnify A&T.

Brownstone eventually settled with A&T and Zurich. The settlement agreement called for a $2 million stipulated judgment in favor of Brownstone and against A&T, $900,000 of which Zurich agreed to pay as A&T's insurer. The agreement also included (1) an assignment to Brownstone of any claims A&T had against Capitol relating to Brownstone's action against A&T; (2) a covenant by Brownstone that, "in no event [would] it execute upon or permit execution of the stipulated judgment against A&T or its assets," but that it would seek recovery of the unexecuted portion of the judgment from Capitol; (3) a promise by A&T that it would cooperate with Brownstone in pursuing the assigned claims against Capitol; and (4) an agreement "to release each and every other settling party *** from all past, present and future claims" except for claims by or between Brownstone and Capitol.

The stipulated judgment was entered in the Multnomah County Circuit Court. Brownstone then served a writ of garnishment on Capitol for $1.1 million, the unpaid portion of the judgment. Brownstone relied on ORS 18.352, which provides:

> "Whenever a judgment debtor has a policy of insurance covering liability, or indemnity for any injury or damage

---

is not relevant to the issues we decide today, and we therefore omit it from our factual account.

to person or property, which injury or damage constituted the cause of action in which the judgment was rendered, the amount covered by the policy of insurance shall be subject to attachment upon the execution issued upon the judgment."

Capitol rejected the writ, and Brownstone applied to the trial court for an order requiring Capitol to appear. *See* ORS 18.778 (process for obtaining order to appear). Capitol continued to resist the garnishment and moved for summary judgment, arguing that Brownstone's covenant not to execute against A&T had released A&T from any legal obligation to pay Brownstone damages. Because the terms of its policy limited Capitol's liability to "those sums that the insured becomes legally obligated to pay," Capitol argued, the effect of the covenant not to execute was to eliminate its obligation of coverage. In support of its summary judgment motion, Capitol relied on this court's decision in *Stubblefield*.

In *Stubblefield*, the plaintiff sued his wife's doctor for alienation of affection and criminal conversation. The doctor was insured, but the insurer declined to defend. The plaintiff and the defendant eventually settled. Under the terms of the settlement agreement, the defendant agreed to pay the plaintiff $5,000. The parties also agreed to the entry of a money judgment against the defendant for $50,000, a covenant by the plaintiff not to execute that judgment for any amount in excess of the $5,000 that the defendant had agreed to pay, and the defendant's assignment of any claims he might have against his insurer in the matter over and above the $5,000 payment.

The plaintiff then initiated an action against the insurance company under the assignment, but the trial court found in favor of the insurance company. This court affirmed, explaining:

"[The defendant's] insurance policy provided that 'the Company will indemnify the Insured for all sums which the Insured shall be *legally obligated to pay* as damages and expenses *** on account of *** personal injuries ***.' Assuming, without deciding, that [the] plaintiff suffered 'personal injuries' which were within the coverage of the policy, the result of the separate 'covenant not to execute' was that the amount which the insured in this case was

'legally obligated' to pay to plaintiff as damages for such personal injuries was the sum of $5,000. The insured agreed, however, to pay that amount to plaintiff himself and that amount was expressly excluded from the assignment and was reserved to the insured. It follows that by the terms of the assignment in this case plaintiff acquired no rights which are enforceable by it against defendant."

*Stubblefield*, 267 Or at 400-01 (emphasis and omissions in original).

In this case, Capitol argued that *Stubblefield* controlled, because the settlement agreement between Brownstone and A&T was, in all material respects, identical to the one at issue in *Stubblefield*, and the terms of coverage were as well. In response, Brownstone argued that *Stubblefield* does not apply to garnishment actions brought under ORS 18.352. According to Brownstone, the plain wording of that statute independently authorizes a judgment creditor to proceed directly against an insurer. In the alternative, Brownstone urged that the legislature abrogated *Stubblefield* in 1989, when it enacted what is now ORS 31.825, which expressly provides that "a defendant in a tort action against whom a judgment has been entered" may assign a claim that the defendant may have against an insurer and that any release or covenant not to sue given for that assignment "shall not extinguish" the claim.

The trial court rejected Brownstone's contentions, concluded that *Stubblefield* controlled, and granted Capitol's motion for summary judgment. Brownstone appealed, reprising its arguments that *Stubblefield* does not apply to garnishment proceedings brought against a judgment debtor's insurer under ORS 18.352, and that, in any event, *Stubblefield* has been abrogated by the legislature's enactment of ORS 31.825. The Court of Appeals rejected both arguments and affirmed.

## II.  ANALYSIS

On review, Brownstone advances three arguments: (1) *Stubblefield* does not apply to garnishment proceedings brought against a judgment debtor's insurer under ORS 18.352; (2) the legislature abrogated *Stubblefield* when it enacted what is now ORS 31.825; and (3) in all events,

*Stubblefield* was incorrectly decided and should be overruled. We consider each of the three arguments in turn.

A.  *Whether* Stubblefield *Applies to Garnishment Proceedings*

Brownstone first argues that *Stubblefield* does not apply to this case. In Brownstone's view there is a key distinction between the facts of *Stubblefield* and this case: namely, the legal mechanism used to satisfy the judgment from the insurer. Brownstone observes that, in *Stubblefield*, the plaintiff proceeded directly against the judgment debtor's insurer under the assignment of claims in the parties' settlement agreement. Brownstone notes that, in this case, it did not assert a common-law claim under an assignment of rights, but instead proceeded under ORS 18.352, which statutorily authorizes parties who have obtained a judgment in an action for damages to proceed directly against the judgment creditor's insurance assets. Plaintiff contends that, although the circumstances in *Stubblefield* might otherwise mirror those of this case, a garnishment proceeding under ORS 18.352 should be controlled by the terms of that statute and not a judge-made rule that speaks specifically to the assignment of a judgment debtor's assignment of claims against its insurer.

As Brownstone sees it, the statute sets out only two requirements for recovery from a judgment debtor's insurance policy: (1) that a judgment has been rendered against the judgment debtor for injury or damage to person or property; and (2) that the judgment debtor has a covered liability for any injury or damage to person or property. Brownstone asserts that both of those requirements are satisfied in this case. Capitol responds that, in fact, Brownstone did not satisfy the second requirement—that "the amount covered" is subject to garnishment. In Capitol's view, "the amount covered" is affected by the fact that the covenant not to execute eliminated A&T's liability to Brownstone and, under *Stubblefield*, eliminated any amount covered as well.

We agree with Capitol. As we have noted, ORS 18.352 provides that, when a judgment has been rendered for injury or damage to person or property and the judgment debtor has a policy of insurance covering liability for such injury or damage to person or property, "*the amount*

*covered*" by that policy is subject to garnishment. (Emphasis added.) *Stubblefield* plainly holds that a covenant not to execute against an insured judgment debtor releases the judgment debtor from any legal obligation to pay damages to the judgment creditor as a matter of law, and, as a result, eliminates any damages that the insurer is "legally obligated to pay" under the policy. The fact that *Stubblefield* happened to be a case in which the plaintiff brought an action against the insurer on an assigned claim had no effect on the court's reasoning and provides no basis for limiting its holding in this case.

This court's cases construing ORS 18.352 confirm that conclusion. In *State Farm Fire & Cas. v. Reuter*, 299 Or 155, 700 P2d 236 (1985), for example, Reuter was charged with sexually assaulting Bullen. Reuter pleaded not guilty by reason of mental disease or defect, but the jury rejected the claim of mental disorder and found him guilty. At the time of the assault, Reuter had a liability policy with State Farm Fire & Casualty. The policy contained an exclusion for intentional injury. Bullen initiated a civil action for damages against Reuter, alleging that the latter had committed the assault when suffering from a mental disorder that rendered the assault something other than an intentional act. State Farm responded with an action for a declaration of its obligations under Reuter's policy, arguing that the criminal conviction established, as a matter of law, that damages arising out of the sexual assault were subject to the exclusion for intentional injuries. *Id.* at 157-58.

This court was thus confronted with the issue of how Reuter's criminal conviction affected Bullen's claim. The court began by noting that, clearly, Reuter was bound by that conviction. *Id.* at 163. The question remained whether Bullen, because of her legal relationship to Reuter, was bound as well. *Id.* at 164. The court explained that, if Bullen obtained a judgment against Reuter under the allegations of her complaint, her remedies included garnishing State Farm under what is now ORS 18.352. *Id.* (discussing ORS 23.230 (1989)). The problem was, the court continued, that if she did that, then "Bullen's rights against State Farm are no greater than that of Reuter. As garnishor, she stands in the shoes of the subrogor." *Id.* at 166. The court noted that,

> "[Bullen's] status is now no more or less derivative than it was before the criminal trial, or will be after the trial of her claim against Reuter, or at any other time. The point is that, although her present status is that of a claimant, her future status, insofar as any claim against State Farm is concerned, would be as a judgment creditor of Reuter (if she prevails on her claim against Reuter). Within that status, *she is subject to the claims or defenses that the insurer has against the one from whom she derives her claim.*"

*Id.* at 167 (emphasis added).

Returning to this case, that means that Brownstone, in bringing the garnishment action against Capitol, stands in the shoes of the insured, A&T, and is subject to any defenses that Capitol could assert against A&T, including Capitol's defense that *Stubblefield* applies to eliminate Capitol's obligation to pay. In short, Brownstone's argument that *Stubblefield* is inapplicable in the present garnishment proceeding under ORS 18.352 is not well taken.

B.   *Whether* Stubblefield *Was Legislatively Abrogated by ORS 31.825*

Brownstone argues that, in any event, *Stubblefield* was legislatively "overruled" in 1989 when the legislature enacted ORS 31.825, which we set out again for the reader's convenience:

> "A defendant in a tort action against whom a judgment has been rendered may assign any cause of action that the defendant has against the defendant's insurer as a result of the judgment to the plaintiff in whose favor the judgment has been entered. That assignment and any release or covenant given for the assignment shall not extinguish the cause of action against the insurer unless the assignment specifically so provides."

Plaintiff contends that, insofar as the statute provides that a release or covenant given in exchange for an assignment "shall not extinguish the cause of action against the insurer," it strikes at the very heart of the *Stubblefield* decision.

Capitol argues that, by its terms, the statute applies only to a settlement by a "defendant in a tort action against

whom a judgment *has been rendered*." According to Capitol, the tense of the emphasized phrase makes clear that the statute applies only to a particular sequence of events: First, a judgment is rendered, and then, once that has occurred, an assignment and covenant not to execute are given. That, Capitol notes, is not what happened in this case; rather, the parties first negotiated the assignment and covenant and only later obtained a judgment.

Brownstone acknowledges that the tense of the statute's wording "might suggest" such a sequence. But it insists that the statute should not be constrained by what it views as a technicality. In Brownstone's view, the statute is at least ambiguous, and that ambiguity is resolved by legislative history showing the legislature intended no such temporal restriction.

Capitol replies that, if Brownstone were correct, then ORS 31.825 would have the effect of abrogating *Stubblefield* entirely, and there is a complete absence of evidence of any such intention in the legislative history. To the contrary, Capitol contends, that history shows that the legislature intended the statute to address not *Stubblefield* generally, but rather the application of *Stubblefield* to a particular type of case.

Again, we agree with Capitol. We first note that the wording of ORS 31.825 suggests a particular sequence of events in which assignments, releases, and covenants "shall not extinguish" the cause of action against the insurer. In stating that "a defendant in a tort action against whom a judgment *has been* rendered" may assign his or her claims, and in thereafter referring to the plaintiff "in whose favor the judgment *has been* entered," the statute appears to describe circumstances in which a judgment resolving a claim against the defendant precedes the defendant's assignment of his or her claims against the insurer to the plaintiff. As this court explained in *Martin v. City of Albany*, 320 Or 175, 181, 880 P2d 926 (1994), "[t]he use of a particular verb tense in a statute can be a significant indicator of the legislature's intention." *See also* [Washburn v. Columbia Forest Products, Inc.](), 340 Or 469, 479, 134 P3d 161 (2006) (verb tense may be dispositive of statutory construction); [V. L. Y. v. Board of Parole](), 338 Or 44, 50, 106 P3d 145 (2005) (same).

In a related vein, we also note that the statute limits the defendant's power to assign causes of action "that the defendant has against the defendant's insurer *as a result of the judgment*." The cause of action that may be assigned is one that "result[s]" from the judgment, which again suggests a particular sequence and a particular type of claims. If, for example, an insurer refused in bad faith to settle within the applicable policy limits, leading to a judgment against the insured in excess of the policy limits, such a claim could be said to be "as a result of a judgment." In this case, however, the claims at issue are directed at Capitol's asserted breach of a contractual duty to defend and indemnify A&T: They do not appear to "result" in any direct sense from a judgment.

The legislative history confirms what the text of ORS 31.825 suggests. The statute was enacted in 1989 as SB 519 (1989). The original bill, introduced at the request of the Oregon Trial Lawyers Association (OTLA), provided injured plaintiffs with a direct claim against a defendant's insurer in the sort of "excess judgment" cases that we have just described:

> "The plaintiff in a tort action may commence a direct action against an insurer of a defendant to recover the amount of a judgment in excess of the amount of limits of insurance available to the defendant in the tort action if the defendant is otherwise entitled to maintain the action against the insurer. The plaintiff need not obtain any assignment of rights against the insurer from the defendant."

That focus on excess judgment claims also is evident from the testimony of Mick Alexander, who represented OTLA. He testified to the Senate Judiciary Committee that the bill "allows a plaintiff in a tort action to directly commence an action against an insurer of a defendant to recover an excess judgment." Testimony, Senate Judiciary Committee, SB 519, Mar 27, 1989, Ex D (statement of Mick Alexander). He explained that the bill was prompted by a Court of Appeals case, *Oregon Mutual Ins. Co. v. Gibson*, 88 Or App 574, 746 P2d 245 (1987), which applied *Stubblefield* to an "excess judgment" case, thereby "ma[king] it very difficult for a plaintiff to be able to proceed to recover an excess judgment

and also release the insured defendant from the litigation." According to Alexander,

> "[t]his bill involves traditional 'bad faith' claims in a third party setting. In other words, a third party has brought an action against an insured, and the insured's own company has failed to take reasonable grounds to settle the case within the policy limits. Oregon recognizes that under such [a] setting, if a judgment is recovered in excess of the policy limits, then the insured has a potential claim against his own insurance company for this excess judgment."

*Id.* He also explained that the bill would provide the same kind of direct action against insurers in excess judgment cases that ORS 743.772 (1989) (now codified at ORS 742.031)[2] provides for judgments against insured defendants that are within policy limits. *Id.*

The Oregon Association of Defense Counsel, represented by John Buehler, objected to the bill. Buehler explained to the Senate Judiciary Committee that providing third-party claimants with a direct cause of action against a defendant's insurer in "bad faith" and negligence cases was contrary to public policy principles that this court had recognized in *Pringle v. Robertson*, 258 Or 389, 483 P2d 814 (1971).[3] He also noted that, under then-extant law, an insured defendant could assign a "bad faith" refusal to settle claim against the

---

[2] The referenced statute, ORS 742.031, provides:

"A policy of insurance against loss or damage resulting from accident *** for which the person insured is liable shall contain within said policy a provision substantially as follows: 'Bankruptcy or insolvency of the insured shall not relieve the insurer of any of its obligations hereunder. If any person or legal representative of the person shall obtain final judgment against the insured because of any such injuries, and execution thereon is returned unsatisfied by reason of bankruptcy, insolvency or any other cause, or it such judgment is not satisfied within 30 days after it is rendered, then such person or legal representatives of the person may proceed against the insurer to recover the amount of such judgment, either at law or in equity, but not exceeding the limit of this policy applicable thereto.'"

[3] In *Pringle*, this court considered a plaintiff's attempt to garnish a judgment against an insured defendant, in excess of the limits of the defendant's policy, from the defendant's insurer, on the theory that the defendant's claim against the insurer for negligently or in bad faith failing to settle within the policy limits was "property" of the defendant in the hands of the insurer and subject to garnishment. This court held that it was against public policy to allow a third party to prosecute the defendant's claim against the insurer without an assignment, and that the claim therefore was not subject to garnishment. 258 Or at 390-94.

defendant's insurer to a plaintiff who had obtained an excess judgment against the defendant. Finally, he noted that ORS 23.230 (1989) (now codified at ORS 18.352) and ORS 743.772 (1989) (now codified at ORS 742.031) already provided plaintiffs with a means of collecting the policy limits from insurers, and he argued that the insured "should have the sole power and authority to decide whether any bad faith claim should be pursued against his insurer for any excess liability." Testimony, Senate Judiciary Committee, SB 519, Mar 27, 1989, Ex E (statement of John Buehler).

After Buehler testified, the committee discussed a proposed amendment to the bill that would require an assignment by the defendant of his or her claims against the insurer, but would provide that the assignment "shall not extinguish the cause of action against the insurer." At that point, Buehler and the committee's counsel, Webber, discussed the timing of the assignment under the modified wording, which roughly follows the wording of ORS 31.825:

> "COUNSEL WEBBER:   SB 519 *would only kick in and the assignment would only take place after the court has issued the judgment in excess of policy coverage?*
>
> "MR. BUEHLER:   That is the reading of the bill ***.
>
> "COUNSEL WEBBER:   But a judgment under the underlying coverage is a precursor to getting the assignment.
>
> "MR. BUEHLER:   That is correct."

Tape Recording, Senate Judiciary Committee, SB 519, Mar 27, 1989, Tape 82, Side A (emphasis added).

The Senate Judiciary Committee passed the amended bill and sent it on to the Civil Law Subcommittee of the House Committee on the Judiciary. There, the bill's OTLA proponents continued to describe the bill's purpose in terms of "excess judgments." Tape Recording, House Committee on Judiciary, Civil Law Subcommittee, SB 519, May 22, 1989, Tape 103, Side B (Testimony of Charles Williamson). Also in that subcommittee, OTLA proposed a further amendment to the bill to clarify that not only an assignment of a defendant's claims against his or her insurer, but "any release or covenant given for the assignment,"

would not extinguish the cause of action against the insurer. The subcommittee passed the bill with the proposed amendment. The staff measure summary prepared at the time again described the bill (which, at that point, was in the form that the legislature would enact into law) in terms of an insurer's bad faith refusal to settle within policy limits. Exhibit K, House Committee on Judiciary, Civil Law Subcommittee, SB 519A, May 22, 1989 (staff measure summary) ("The measure would allow a defendant to assign a *bad faith claim* to the plaintiff without extinguishing the cause of action by the act of assignment.").

The foregoing legislative history dispels any doubt about what the legislature intended by enacting ORS 31.825. It intended to allow insured defendants to assign a specific type of claim against their insurer—claims that the insurer's negligent or bad faith failure to settle within policy limits had resulted in an "excess judgment"—to the plaintiff, in exchange for a covenant not to execute against the defendant, without extinguishing the underlying liability. And it intended to permit that outcome only when the excess judgment is in place *before* the assignment is given. Contrary to Brownstone's theory, there is no evidence that the legislature intended to abrogate *Stubblefield* in its entirety.

C.   *Whether* Stubblefield *Should Be Overruled*

There remains Brownstone's argument that *Stubblefield* was wrongly decided and should be overruled. Our consideration of that argument is constrained by the doctrine of *stare decisis*, which requires that we "begin with the assumption that issues considered in our prior cases are correctly decided." *Farmers Ins. Co. v. Mowry*, 350 Or 686, 698, 261 P3d 1 (2011). At the same time, however,

> "this court's obligation *** when formulating the common law is to reach what we determine to be the correct result in each case. If a party can demonstrate that we failed in that obligation and erred in deciding a case, because we were not presented with an important argument or failed to apply our usual framework for decision or adequately analyze the controlling issue, we are willing to reconsider the earlier case."

*Id.*

In this case, Brownstone argues that the court in *Stubblefield* failed to apply the usual framework for interpreting policies of insurance and failed to offer any reasoned explanation for its conclusion about the effects of the settlement agreement. According to Brownstone, the court simply declared, *ipse dixit*, that, when a policy covers damages that an insured is "legally obligated to pay" and the insured agrees to entry of a stipulated judgment against it in exchange for the plaintiff's covenant not to execute the stipulated judgment, that settlement eliminates the liability of both the insured and the insurer. That conclusion, Brownstone contends, is incorrect, because a covenant not to execute does not extinguish a claim or eliminate liability, but rather constitutes an agreement by the settling plaintiff not to execute on the judgment. At the very least, Brownstone contends, the *Stubblefield* court should have acknowledged that the phrase "legally obligated to pay" is ambiguous, triggering the rule that such ambiguous terms must be construed against the insurer. Brownstone observes that *Stubblefield*, in reaching a contrary conclusion, stands virtually alone. Nearly every other state court that has addressed the issue, it asserts, has concluded that covenants not to execute do not extinguish claims so as to preclude recovery from an insurer.

Capitol argues that *Stubblefield* has stood as precedent for more than four decades and should not be disturbed. The phrase "legally obligated to pay," the insurer argues, has a plain meaning—the meaning that the court identified in that decision. In Capitol's view, we should be undeterred by decisions of other state courts, however many of them there may be.

On this issue, Brownstone has the better of the argument. As it correctly notes, this court's reasoning in *Stubblefield* was sparse, to say the least. The entirety of its analysis of the meaning of the policy and its effect on the insurer's liability consisted of the four sentences that we have quoted above, without any reference to our usual approach to interpreting policies of insurance, *see Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 470-71, 836 P2d 703 (1992) (summarizing analysis), and indeed, without citation to any authority. The court engaged in no examination of the wording of the policy, no consideration of

its context, no determination whether the policy was ambiguous, and no discussion of what considerations weighed in favor of resolving any ambiguity one way or the other. The court simply concluded summarily that an insured who has received a covenant not to execute a judgment for damages is not "legally obligated to pay" those damages.

As it turns out, however, there is much more to the issue than that. The court's bare conclusion in *Stubblefield* glosses over a number of issues that lead us to conclude that its holding must be reconsidered.

First, *Stubblefield* paid inadequate attention to the court's own prior case law, in particular, *Groce v. Fidelity General Insurance*, 252 Or 296, 448 P2d 554 (1968). In that case, Stayton was involved in an auto accident in which one person was killed and another injured. Fidelity, which insured Stayton, declined to settle for its insured's policy limits. Thereafter, the plaintiffs obtained a judgment against Stayton for well in excess of those policy limits. Stayton settled with the plaintiffs. Under the terms of the settlement agreement, he assigned his claims against Fidelity for wrongful refusal to settle in exchange for a release of liability. Fidelity meanwhile paid its policy limits, but no more. When the plaintiffs then proceeded against Fidelity, the insurer argued that the claim was not assignable. The court, however, rejected Fidelity's arguments.

Fidelity began by arguing that allowing assignability of such claims would "foster collusion and militate against settlements." The court found that argument "unconvincing." *Id*. at 304. "All an insurance company need to do to avoid the evils of collusion is to exercise good faith with reference to the rights of its insured." *Id*.

Fidelity then argued that, because Stayton had been released, there was no further liability for Fidelity to cover. The court rejected that argument as well, explaining that accepting it would "defeat the purpose of these assignments. An injured plaintiff would be reluctant to accept an assignment unless it provided that the insured would be released only upon full recovery from the insured," and the result would be a "needlessly complicated and unjust procedure." *Id*. at 310-11.

The court's rationale concerning the latter point would seem directly applicable to *Stubblefield*. But the court in *Stubblefield* was apparently unaware. It did mention *Groce*, but then—oddly—declared that it did not have to address the applicability of the decision because the policy at issue in *Stubblefield* required the insurer to cover only those sums its insured was "legally obligated to pay," and the covenant not to execute eliminated any such legal obligation. 267 Or at 400. To be sure, there is no indication that the policy in *Groce* contained the same "legally obligated to pay" phrase. But the insurer's argument in that case was essentially the same argument that the insurer made in *Stubblefield*—that the settlement, by eliminating the insured's further liability, extinguished the insurer's, as well. *Stubblefield* did not even address the point.[4]

Second, apart from prior precedent, there is the doctrinal question whether a covenant not to execute constitutes a release that, of its own force, extinguishes any further liability. Courts in other jurisdictions that have considered that question have concluded, almost uniformly, that it does not. *See generally* Justin A. Harris, *Judicial Approaches to Stipulated Judgments, Assignments of Rights, and Covenants Not To Execute in Insurance Litigation*, 47 Drake L Rev 853, 858 (1999) ("The majority rule is that a covenant not to execute is a contract and not a release—tort liability on behalf of the insured still exists and the provider is still obligated to indemnify its insured. \*\*\* The trend seems to lean overwhelmingly toward the majority rule."). They have concluded, instead, that, when a covenant not to execute is given in the context of a settlement agreement for valuable consideration (specifically, an assignment of claims), it is a contractual promise not to sue the defendant on the judgment and not a release or extinguishment of the defendant's legal obligation to pay it.

---

[4] *Stubblefield* suggested that *Groce* was distinguishable on the theory that it arose under a statute that provided tort plaintiffs who obtain a judgment against an insured defendant with a direct action against the defendant's insurer, if the judgment was not paid within 30 days. *Stubblefield*, 267 Or at 401. But that suggestion, if intended, was incorrect: As described, the plaintiffs in *Groce* proceeded against the defendant's insurer under an assignment, not under the statute.

The Illinois Supreme Court's decision in *Guillen ex rel. Guillen v. Potomac Ins. Co. of Illinois,* 203 Ill 2d 141, 785 NE2d 1 (2003), serves to illustrate. In that case, the plaintiff initiated an action against her landlords for lead poisoning resulting from exposure to lead-based paint and dust in her apartment. The landlords' insurer denied any obligation to defend or indemnify. The plaintiff eventually settled with her landlords, who agreed to a judgment against them for $600,000 in exchange for a covenant not to execute that judgment and an assignment of their claim against the insurer. The plaintiff then initiated an action against the insurer under the assignment. The insurer argued that, in light of the settlement, there remained nothing that defendants were "legally obligated" to pay and, as a result, nothing for the insurer to indemnify. *Id.* at 142-46.

The court rejected the argument, explaining:

"When confronted by a settlement agreement consisting of a stipulated judgment, an assignment and a covenant not to execute, insurers have maintained * * * that the covenant not to execute effectively extinguishes the insured's legal obligation to pay since the insured has no compelling obligation to pay any sum to the injured party. The majority of courts, however, have rejected this argument.

"The construction of the 'legally obligated to pay' language adopted by the majority of the courts is a technical, rather than practical, one. Courts accepting the conclusion that the insured remains 'legally obligated to pay' when the settlement consists of a judgment, covenant not to execute, and an assignment hold that a covenant not to execute is a contract and not a release. The insured still remains liable in tort and a breach of contract action lies if the injured party seeks to collect on the judgment. Thus, under this construction, the insured is still 'legally obligated' to the insured plaintiff, and the insured retains the right to indemnification from the insurer."

*Id.* at 160 (citations omitted).[5]

---

[5] *See also Gray v. Grain Dealers Mut. Ins. Co.*, 871 F2d 1128, 1133 (DC Cir 1989) ("[W]e see no reason why, under D.C. and North Carolina law, we should not construe the assignment and release to give full effect to its terms."); *Globe Indemnity Co. v. Blomfield*, 115 Ariz 5, 8, 562 P2d 1372, 1375 (1977) ("A covenant not to execute is merely a contract and not a release. It seems reasonable to conclude, therefore, that the insured's tort liability remains but that he has an action

Other courts adopt the majority view, but for a slightly different reason: namely, that the phrase "legally obligated to pay," if undefined in the policy, is ambiguous and, as a result, must be construed against the insurer. *See, e.g.*, *Metcalf v. Hartford Accident & Indemnity Co*, 176 Neb 468, 126 NW2d 471 (1964); *Coblenz v. American Surety Co*, 416 F2d 1059, 1062-63 (5th Cir 1969) (applying Florida law); *American Mutual Insurance Co. v. Kivela*, 408 NE2d 805, 812-13 (Ind Ct App 1980).

There is a minority view, which holds that even if, doctrinally speaking, a covenant not to execute does not extinguish liability, it nevertheless has that practical effect. Courts adopting that view invoke a competing public policy of avoiding the possibility of collusion between the plaintiff and the insured defendant. *Freeman v. Schmidt Real Estate & Insurance, Inc.*, 755 F2d 135 (8th Cir 1985), is the leading decision for that the minority view. In that case, the defendant confessed judgment and assigned his claim against his insurer to the plaintiff in exchange for the plaintiff's covenant not to execute the judgment. When the plaintiff brought the assigned claim against the insurer, the trial court entered summary judgment against the plaintiff, concluding that the covenant not to execute relieved the defendant of any obligation to pay the plaintiff and, as a result, relieved the insurer of any obligation to indemnify. *Id.* at 136-37.

---

for breach of contract if the plaintiff attempts to collect the judgment in violation of the covenant."); *McLellan v. Atchison Ins. Agency, Inc.*, 81 Haw 62, 68, 912 P2d 559, 565 (1996) ("[T]he better choice is to hold that a covenant not to execute does not *per se* eliminate the fact of damages and then to permit an injured plaintiff to recover damages from the insurer."); *Campione v. Wilson*, 422 Mass 185, 192-93, 661 NE2d 658, 662 (1996) ("[W]e discern no compelling reason not to recognize the assignment of the negligence claims."); *J & J Farmer Leasing, Inc. v. Citizens Ins. Co. of America*, 472 Mich 353, 696 NW2d 681, 684 (2005) ("[A] covenant not to sue is merely an agreement not to sue on an existing claim. It does not extinguish a claim or cause of action."); *Kobbeman v. Oleson* 574 NW2d 633, 636 (SD 1998) (A covenant not to execute is "merely a contract *** such that the underlying tort liability remains and a breach of contract action lies in favor of the insured if the injured party seeks to collect his judgment."); *Tip's Package Store, Inc. v. Commercial Ins. Managers, Inc.*, 86 SW3d 543, 555 (Tenn 2001) ("covenant not to execute *** was a contract between these parties which did not extinguish the underlying liability"); *Gainsco Ins. Co. v. Amoco Production Co.*, 53 P3d 1051, 1061 (Wyo 2002) ("We agree with *** those cases that find that the inclusion of a covenant not to execute in the settlement agreement between an insured and a claimant *** does not bar the claimant, an assignee of the insured, from pursuing a claim against the insurer.").

The Court of Appeals for the Eighth Circuit affirmed. The federal court noted that the issue was one of first impression under Iowa state law, but that considerations of public policy weighed in favor of giving a practical construction to covenants not to execute and holding that they extinguishing further liability. *Id.* at 139. Specifically, the Eighth Circuit explained that existing Iowa case law reflected concern about encouraging "collusive settlements," which might result from allowing the assignment of claims against insurers under the circumstances of that case. *Id.*[6]

It is worth noting, however, that when the Iowa Supreme Court later addressed the issue, it rejected the Eighth Circuit's view of that state's law. In *Red Giant Oil Co. v. Lawlor*, 528 NW2d 524 (Iowa 1995), the Iowa Supreme Court concluded that the Eighth Circuit's concern about the possibility of collusive settlements was misplaced. "Prejudgment assignments *** in return for covenants not to execute," the court explained, "are not inherently collusive or fraudulent." *Id.* at 533. Moreover, the court continued, such agreements are supported by a countervailing policy that insureds should be entitled to protect themselves against insurers who wrongfully refuse to defend. *Id.* In the end, the Iowa Supreme Court concluded that, consistently with the majority view, a covenant not to execute "was merely an agreement *** and was not a release," leaving the insured still "legally obligated" to the plaintiff. *Id.* at

---

[6] Two other courts of which we are aware have concluded that a covenant not to execute extinguishes any legal obligation to pay. In *Huffman v. Peerless Ins. Co.*, 17 NC App 292, 294, 193 SE2d 773, 774 (1973), the North Carolina Court of Appeals held that a plaintiff proceeding under assignment of rights from insured defendants with whom it settled could not obtain indemnity from the defendant's insurer. The court's sole explanation was that "[o]bviously, under the terms of the consent judgment [the insureds] were not legally obligated to pay damages to plaintiff." In *Bendall v. White*, 511 F Supp 793, 794 (ND Ala 1981), a federal district court reached a similar conclusion, based on its own understanding of Alabama law. However, the Supreme Court of Alabama effectively rejected *Bendall* as a correct statement of Alabama law in *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.*, 851 So2d 466, 488-91 (Alabama 2002). In a third case, *American Cas. Co. of Reading, Pa. v. Griffith*, 107 Ga App 224, 227, 129 SE2d 549, 551-52 (1963), the court appeared to embrace something akin to the minority rule in the context of a completely different kind of agreement. *Griffith* was found to be distinguishable in *Dowse v. Southern Guarantee Ins. Co.*, 263 Ga App 435, 441-42, 588 SE2d 234, 238 (2003), a later Georgia case holding that a covenant not to execute does *not* extinguish the insured defendant's liability.

532. Citing *Metcalf*, the court added that, at best, the reference in the policy to amounts that the insured was "legally obligated to pay" was ambiguous, and, because of that ambiguity, the phrase must be construed against the insurer, leaving the insurer obligated to indemnify the insured from liability if there is coverage under the terms of the policy. *Id.* at 533.

Of course, the terms of a particular settlement agreement could make it clear that the parties to that agreement intended the covenant not to execute to have the effect of extinguishing further liability. *Cf.* *James v. Clackamas County*, 353 Or 431, 441-42, 299 P3d 526 (2013) (to determine intent of contract term, court looks at contract as a whole); *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997) (court determines meaning of contract term in the context of the parties' entire agreement). In that regard, this court's decision in *Lancaster v. Royal Ins. Co. of America*, 302 Or 62, 726 P2d 371 (1986), warrants careful attention. In that case, the plaintiff was injured in an auto accident. He brought an action against the defendant and the defendant's insurer, which had denied coverage and refused to defend its insured. Plaintiff ultimately settled with the defendant. Under the terms of that settlement, the defendant agreed to a stipulated judgment against him and to assign his rights against his insurer to the plaintiff. In return, the plaintiff agreed not to execute the judgment against the defendant "personally." When the plaintiff later sued the defendant's insurer as the defendant's assignee, the insurer invoked *Stubblefield* for the contention that the covenant not to execute had extinguished both the defendant's and the insurer's liability. The trial court granted summary judgment for the insurer on that ground. *Id.* at 64-65.

This court reversed, concluding that whether a settlement including a covenant not to execute extinguishes liability depends on the wording of the particular settlement agreement. "When an insured gives an injured party an assignment of rights in exchange for a 'covenant not to execute,'" the court explained, "the agreements are a contract and their effect is determined by standard contract principles, *i.e.*, interpretation of the language of the agreements." *Id.* at 67. The particular wording of the covenant—promising

not to execute against defendant *personally*—led the court to conclude that "the covenant involved here is ambiguous as to whether the insured was legally obligated to the plaintiff." *Id.* Consequently, the court held, it was error for the trial court to have granted summary judgment to the insurer. *Id.* at 68-69.

*Lancaster* has been read by some to have overruled, implicitly, this court's earlier *Stubblefield* decision. *See, e.g.*, Harris, 47 Drake L Rev at 858-59 n 25 (citing *Lancaster* as "having the practical effect of overruling *Stubblefield*"). We need not determine whether that characterization of *Lancaster* is accurate because we conclude, expressly, that *Stubblefield* was wrongly decided. The decision stands unsupported by any explanation or analysis. It cannot easily be reconciled with then-existing precedents, in particular, *Groce*. And it is contradicted by the well-considered decisions of nearly every other court to have considered the question whether a covenant not to execute, in and of itself, acts as a release that extinguishes further liability. The argument that agreements containing assignments in exchange for such covenants invite collusion was anticipated and summarily rejected in *Groce*. And, in any event, there is no argument in this case that any collusion occurred. We leave for another day the issue whether collusion or fraud in a settlement might supply grounds for rejecting a stipulated or consent judgment given in exchange for a covenant not to execute.[7]

---

[7] Some courts have suggested that, because of the danger of collusion or fraud, insurers can never be bound by a stipulated judgment arising out of a settlement agreement involving an assignment of rights in exchange for a covenant not to execute. *See, e.g.*, *State Farm Fire and Cas. Co. v. Gandy*, 925 SW2d 696, 714 (Tex 1995). Others appear to treat the stipulated judgment as presumptive evidence of the insured's liability and the amount of the damages, which presumption the insurer may rebut by showing that the settlement was unreasonable or in bad faith. *See, e.g.*, *Kershaw v. Maryland Casualty Co.*, 172 Cal App 2d 248, 342 P2d 72 (1959). Still others treat the issues of reasonableness and collusion/good faith as entirely separate issues, requiring the party seeking to recover from the insurer to bear the burden of proof on the issue of reasonableness and then allowing the insurer to raise collusion and bad faith as affirmative defenses. *See, e.g.*, *Red Giant Oil*, 528 NW2d at 534-35 (describing and applying that approach). Finally, some courts employ a burden shifting approach, under which the party seeking recovery must bear the initial burden of producing evidence sufficient to establish a presumption of reasonableness and good faith: If that burden of production is satisfied, the burden shifts to the insurer to persuade

At the very least, we agree with other courts that have concluded that the phrase "legally obligated to pay"—at least as it is commonly used in liability insurance policies—is ambiguous, thus triggering the well-worn rule that such ambiguities in insurance policies are to be construed against the insurer. *Hoffman Construction*, 313 Or at 469-70 ("[A]mbiguous terms contained within an insurance policy are to be construed against the insurer, who drafted the policy."); *Chalmers v. Oregon Auto Ins. Co.*, 262 Or 504, 509, 500 P2d 258 (1972) (same); *Farmers Mut. Ins. Co. v. Un. Pac. Ins.*, 206 Or 298, 305, 292 P2d 492 (1956) (same).

As we have just noted, it certainly is possible that parties can frame settlements in such a way as to make clear an intention that a covenant not to execute has the effect of completely releasing the insured from liability. In this case, however, the parties do not refer to any particular provision of the settlement agreement that unambiguously evinces that intention. To the contrary, the terms of the settlement agreement spell out the parties' shared intent that Brownstone would be able to satisfy the judgment from A&T's insurance assets. The settlement agreement does contain a release, but the agreement also expressly excepts from that release claims by Brownstone against Capitol.

In overruling *Stubblefield*, we are mindful of the fact that it has remained the law of this state for more than 40 years. *See Mowry*, 350 Or at 700-01 (noting the importance of reliance on existing precedents in the area of commercial transactions). But there is no indication that, during that time, the decision has been relied on extensively. In fact, this court has addressed *Stubblefield* in only two subsequent cases. The first was *Collins v. Fitzwater*, 277 Or 401, 560 P2d 1074 (1977), in which this court distinguished *Stubblefield* on the ground that the assignment and nonexecution covenant at issue had preceded the judgment against the defendant. The court declined to conclude that the covenant at issue, which had post-dated the stipulated judgment in the case,

---

the court by a preponderance of the evidence that the settlement is unreasonable, collusive, or fraudulent. *See, e.g.*, *Griggs v. Bertram*, 88 NJ 347, 364-68, 443 A2d 163, 171-74 (1996) (using burden shifting approach); *Pruyn v. Agricultural Ins. Co.*, 36 Cal App 4th 500, 528-30, 42 Cal Rptr 2d 36 (1995) (same).

had released the insurer along with the defendant/insured. *Id.* at 409-11. The second case was *Lancaster*, which, if it did not implicitly overrule *Stubblefield*, significantly limited it to cases in which the settlement agreement unambiguously and unconditionally eliminates insurance liability. In both cases, the court limited the reach of *Stubblefield*. In neither did the court have the opportunity to consider *Stubblefield*'s doctrinal or logical underpinnings.

Likewise, the Court of Appeals has applied *Stubblefield* in only a handful of cases over the past four decades. In *Leach v. Scottsdale Indemnity Co.*, 261 Or App 234, 248, 323 P3d 337, *rev den*, 356 Or 400 (2014), the Court of Appeals followed *Lancaster* and concluded that the ambiguity of the relevant settlement agreement rendered *Stubblefield* inapplicable. The court did the same thing in *Terrain Tamers v. Insurance Marketing Corp.*, 210 Or App 534, 541, 152 P3d 915, *rev den*, 343 Or 115 (2007), and *Warren v. Farmers Ins. Co.*, 115 Or App 319, 332, 838 P2d 620 (1992). In *Portland School Dist. v. Great American Ins. Co.*, 241 Or App 161, 175-76, 249 P3d 148, *rev den*, 350 Or 573 (2011), the court concluded that *Stubblefield* did not apply because the underlying agreement expressly reserved claims against the insurer. In only two decisions of which we are aware, *Far West Federal Bank v. Transamerica Title Ins. Co.*, 99 Or App 340, 345, 781 P2d 1259 (1989), *rev den*, 309 Or 441 (1990), and *Gibson*, 88 Or App at 574-78, did the Court of Appeals conclude that *Stubblefield* controlled.

Moreover, *Stubblefield* did not announce the sort of rule that later became the basis for structuring common commercial transactions, as for example, the rule at issue in *Mowry*, on which insurers relied in drafting standard insurance policies. 350 Or at 700-01. Under the circumstances, the passage of time does not weigh particularly heavily in our evaluation of the continuing vitality of the *Stubblefield* decision.

In short, we conclude that *Stubblefield* erred when it concluded that a covenant not to execute obtained in exchange for an assignment of rights, by itself, effects a complete release that extinguishes an insured's liability and, by extension, the insurer's liability as well. It necessarily

follows that the trial court in this case likewise erred in concluding that the existence of such a covenant not to execute as a component of the parties' settlement agreement had the effect of extinguishing A&T's liability to Brownstone and, as a result, had the effect of extinguishing Capitol's liability as well.

The judgment of the circuit court and the decision of the Court of Appeals are reversed, and the case is remanded to the circuit court for further proceedings.