No. 38      September 25, 2025      271

IN THE SUPREME COURT OF THE
STATE OF OREGON

In the Matter of the Compensation of
Thomas K. Cardoza, Claimant.

Andrew TEITELMAN,
Personal Representative of the Estate of
Thomas K. Cardoza, Deceased,
*Respondent on Review,*

*v.*

SAIF CORPORATION
and Werner Gourmet Meat Snacks, Inc.,
*Petitioners on Review.*

(WCB 1906431; 2003506) (CA A176678) (SC S071117)

En Banc

On review from the Court of Appeals.*

Argued and submitted April 17, 2025.

Daniel Walker, Appellate Counsel, SAIF Corporation, Salem, argued the cause and filed the briefs for petitioners on review.

Bennett Dalton, The Dalton Law Firm, Portland, argued the cause and filed the brief for respondent on review.

Theodore P. Heus, Quinn & Heus, LLC, Beaverton, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

BUSHONG, J.

The decision of the Court of Appeals is affirmed. The order of the Workers' Compensation Board is reversed, and the case is remanded to the board for further proceedings.

Garrett, J., dissented and filed an opinion, in which DeHoog, J., joined.

_____

* On judicial review of an order of the Workers' Compensation Board. 332 Or App 72, 548 P3d 140 (2024).

**BUSHONG, J.**

This workers' compensation case presents a statutory interpretation issue regarding a worker's request for a medical examination in connection with a disputed benefits claim. Claimant sought workers' compensation benefits, contending that he had injured his back at work. His employer's insurer, SAIF Corporation (SAIF), investigated and sent claimant a written notice of denial, concluding that claimant's back condition had not been caused by a work-related injury. After claimant requested a hearing, SAIF required claimant to submit to an independent medical examination (IME).[1] The resulting IME report supported SAIF's decision to deny the claim. Claimant then sought a worker requested medical examination (WRME) under ORS 656.325(1)(e). That statute authorizes a WRME if, among other things, a claimant has requested "a hearing on a denial of compensability *** that is based on" an IME report.

The question in this case is whether the Workers' Compensation Board (board) erred in denying claimant's request because it determined that claimant had not requested "a hearing on a denial of compensability *** that is based on" an IME report. In particular, the question is whether we determine if a denial of compensability "is based on" an IME report by looking at the grounds for denial when claimant requested a hearing or when claimant's request for a WRME was decided. At the time of the hearing request, the denial was not based on an IME report because no IME had been requested or performed. But, at the time of the decision on claimant's WRME request, SAIF's continuing denial *was* based on an IME report because the IME had been conducted, the resulting report supported SAIF's denial, and SAIF had confirmed that it intended to rely on the report to defend its denial at the upcoming hearing.

---

[1] Although the term "independent medical examination" (IME) is often used in workers' compensation cases, we have referred to the examination required by ORS 656.325(1)(a) as a "compelled medical examination" (CME), *Robinson v. Nabisco, Inc.*, 331 Or 178, 181, 11 P3d 1286 (2000), and the Court of Appeals has referred to the examination as an "insurer medical examination" (IME), *Darling v. Johnson Controls Battery Group*, 188 Or App 190, 192 n 1, 70 P3d 894 (2003), *rev den*, 336 Or 376 (2004). The administrative rules use the terms "independent medical examination" (IME) and "worker requested medical examination" (WRME). *See* OAR 436-010-0265. We use the terms "IME" and "WRME" in this opinion without attaching any significance to those labels.

We hold that, to determine whether a claimant has requested "a hearing on a denial of compensability * * * that is based on" an IME report, we look at the grounds for denial at the time that a claimant's request for a WRME was decided. The legislature intended the WRME to provide workers with evidence that they could use to counter an IME report that the insurer uses in litigating the denial of a disputed claim. Because an insurer may request, and begin to rely on, an IME after a claimant has requested a hearing, as occurred in this case, a claimant's right to a WRME is not limited to the grounds for denial at the time of the hearing request. We therefore conclude that the board erred in denying claimant's request for a WRME.

## I.  BACKGROUND

The facts are procedural, undisputed, and taken from the agency record. The original claimant, Thomas K. Cardoza, filed a workers' compensation claim, alleging that he injured his back on the job at Werner Gourmet Meat Snacks, Inc. (Werner). SAIF—Werner's workers' compensation insurer—investigated and sent Cardoza a notice of denial, stating that he had not sustained a compensable injury arising out of, or in the course of, his employment. Cardoza filed a timely request for a hearing before an administrative law judge (ALJ) to challenge that decision.[2] At that point, SAIF requested that Cardoza submit to an IME conducted by a physician that SAIF selected, Dr. Ballard. Cardoza complied with that request.

Ballard's IME report supported SAIF's denial decision, concluding that Cardoza's preexisting back condition—not an injury suffered at work—was the major cause of any disability or need for treatment. Cardoza's treating physician, Dr. Mitchell, then signed a letter indicating that he disagreed with Ballard's opinion. In Mitchell's opinion, the major cause of Cardoza's need for treatment was a work injury. Cardoza then submitted a request pursuant to ORS 656.325(1)(e) to the Workers' Compensation Division for authorization of a WRME, citing the conflict between Ballard's IME report and Mitchell's opinion. The division's

---

[2] The hearing was originally scheduled for February 24, 2020. It was then rescheduled for June 11, 2020, and then rescheduled again for October 2, 2020.

Medical Resolution Team (MRT) denied Cardoza's request. The MRT's written order indicated that, although it had "received no insurer objection to the WRME request," it was denying Cardoza's request because Ballard's IME had been conducted *after* SAIF's written notice of denial.

Cardoza's attorney requested a hearing on the WRME denial and asked that the hearing be consolidated with the hearing on SAIF's denial of compensability. SAIF was required by rule to file and serve its hearing exhibits 28 days before the hearing. OAR 438-007-0018(1).[3] After SAIF had filed its hearing exhibits, Cardoza's attorney sent a letter request to the ALJ, asking him to order SAIF to either amend its denial of the claim to reflect that the denial was now "based on" an IME report or withdraw the IME report as a hearing exhibit. In a letter to the ALJ, SAIF opposed both requests, stating that its defense of the denial "includes the post-denial IME" and that "[i]ssuance of the denial, and defense of the denial, are two different things."

The ALJ then issued an "Interim Order" denying Cardoza's request for a WRME and denying his request for an order requiring SAIF to either amend its denial to state that it is based on Ballard's IME report or withdraw the report as a proposed exhibit. After the hearing, the ALJ upheld the denial of Cardoza's claim, citing Ballard's IME report as "persuasive" evidence that Cardoza's claim was not compensable. Cardoza filed a timely appeal to the board, challenging both the denial of compensability and the denial of his request for WRME authorization. The board affirmed the ALJ's orders on both issues. Cardoza filed a timely petition for judicial review of the board's decisions in the Court of Appeals.

Cardoza died while his petition was pending in the Court of Appeals. The court granted a motion filed by the personal representative of Cardoza's estate to be substituted

---

[3] The agency record does not reflect exactly when SAIF filed its exhibits. SAIF's initial exhibit list described Exhibits 1-9; its supplemental exhibit list described chart notes from 2013-14 marked as Exhibits A through E, and Ballard's IME report, which was marked as Exhibit 10. As noted, OAR 438-007-0018(1) required SAIF to submit its exhibits no later than 28 days before the hearing. It is unclear whether SAIF filed its exhibits and exhibit lists at least 28 days before the hearing scheduled for June 11, 2020, that was subsequently rescheduled, or whether those materials were first filed at least 28 days in advance of the October 2, 2020, hearing.

as the petitioner and the appeal proceeded. On the merits, the Court of Appeals agreed with petitioner that the board had erred in denying Cardoza's request for WRME authorization and remanded the claim to the board for further proceedings. The court saw nothing in the text, context, or legislative history of ORS 656.325(1)(e), or in the implementing administrative rule, OAR 436-060-0147, that required an IME report to be requested and completed *before* SAIF issued its written notice for the "denial of compensability" to be "based on" an IME report. Thus, the court concluded that "SAIF's denial was based on an IME." *Teitelman v. SAIF*, 332 Or App 72, 78, 548 P3d 140 (2024).[4]

We allowed review on SAIF's petition to address the statutory interpretation issue.

## II.   DISCUSSION

The issue on review hinges on the interpretation of ORS 656.325(1)(e), which is part of Oregon's Workers' Compensation Law. *See* ORS 656.001 ("This chapter may be cited as the Workers' Compensation Law."). We review the interpretation of a statute for legal error, applying our usual statutory interpretation framework to ascertain the legislature's intent by examining the text, context, and any legislative history of the statute that is useful to our analysis. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We begin with an overview of the Workers' Compensation Law before turning to the specific provision in dispute.

A.   *Overview of Workers' Compensation Law*

Oregon's Workers' Compensation Law was designed to provide an exclusive statutory system that results in "the best societal measure" of compensation for work-related injuries. ORS 656.012(1)(c). One objective of the law is to provide "a fair and just administrative system for delivery of medical and financial benefits to injured workers[.]" ORS 656.012(2)(b). The legislature has declared, "[i]n recognition that the goals and objectives of this Workers' Compensation

---

[4] The Court of Appeals noted in a footnote that neither party had suggested the Cardoza's death rendered the petition for judicial review proceeding moot, leaving it to the board on remand to address the effect, if any, Cardoza's death had on the claim. *Teitelman*, 332 Or App at 78 n 1.

Law are intended to benefit all citizens, * * * that the provisions of this law shall be interpreted and understood in an impartial and balanced manner." ORS 656.012(3).

Under the Workers' Compensation Law, except where the right to compensation is denied by the insurer or self-insured employer, a worker is entitled to receive benefits to compensate for a work-related injury "upon the employer's receiving notice or knowledge of a claim[.]" ORS 656.262(2). A worker suffering a work-related injury is required to give notice to the employer no later than 90 days after the accident that caused the injury. ORS 656.265(1)(a). That starts the process for resolving the worker's claim for benefits. A "claim" is "a written request for compensation * * * or any compensable injury[.]" ORS 656.005(6).[5] Injured workers have a duty to "cooperate and assist the insurer * * * in the investigation of claims for compensation." ORS 656.262(14)(a).

A "compensable injury" is an accidental injury "arising out of and in the course of employment requiring medical services or resulting in disability or death." ORS 656.005(7)(a). An employer receiving notice of any claim or accident that may result in a compensable injury must notify its insurer not later than five days after receiving notice. ORS 656.262(3). When a worker is injured at work, the injury is considered a compensable injury "from the moment of its occurrence, even if the insurer denies that the injury is compensable, and even if the administrative and judicial systems take months or years to determine the validity" of that denial. *Armstrong v. Rogue Federal Credit Union*, 328 Or 154, 159-60, 969 P2d 382 (1998).

An insurer that receives notice that a worker may have suffered a compensable injury is responsible for processing the worker's claim and providing compensation. ORS 656.262(1). Some benefits are payable immediately, even before the insurer has decided whether to accept or deny the claim. *See* ORS 656.262(4) (temporary disability benefits authorized by the worker's attending physician).

---

[5] We have recognized that the "disjunctive" definition of "claim" reflects a "distinction between a dispute over the compensability of an injury and a dispute over the amount of a claimant's benefits[.]" *SAIF Corp. v. Allen*, 320 Or 192, 201-02, 881 P2d 773 (1994).

The insurer is required to send the claimant a "[w]ritten notice of acceptance or denial of the claim" within 60 days after the employer has notice or knowledge of the claim. ORS 656.262(6)(a).[6]

If an insurer provides written notice of acceptance and later obtains evidence that the claim was not compensable, it may under some circumstances "revoke the claim acceptance and issue a formal notice of claim denial" no later than two years after the date of the initial acceptance. ORS 656.262(6). A worker can add claims for new or omitted medical conditions after the initial acceptance. ORS 656.262(6); ORS 656.267. If the insurer sends a written notice of denial, a worker seeking to contest that decision must file a request for hearing not later than the 60th day after the insurer mailed the notice of denial to the worker. ORS 656.319 (1)(a). A written notice of a denial is considered "a key procedural component of the claim adjudication system." *Allen*, 320 Or at 213. The notice "furnishes important information" to the affected parties, the board, and others, and it is used to "guide the dispute to the proper decision-making body within the compensation system[.]" *Id.* at 214.

The IME process is described in ORS 656.325(1)(a), which states that "[a]ny worker entitled to receive compensation under this chapter" is required upon request of the insurer to submit to an IME. The insurer may request "[n]o more than three" IMEs without prior authorization of the director. ORS 656.325(1)(a). The insurer chooses the physician from a list of qualified physicians approved by the director. ORS 656.325(1)(b); *see also* OAR 436-010-0265(1)(d) (stating that the insurer "must choose the medical service provider from the director's list of authorized IME providers" and that "the insurer may not use the IME report" if the provider is not on the approved list at the time of the IME).

The worker "must comply with a request for [an IME] or face suspension of the right to compensation." *Robinson v.*

---

[6] An insurer's failure to provide notice of acceptance or denial of a claim within 60 days as required by ORS 656.262(6) may be treated as a denial of the claim. *See Allen*, 320 Or at 216 (holding that the board's conclusion that an insurer had denied a claim when the insurer did not provide written notice of acceptance or denial of a claim within the time specified by ORS 656.262(6) was supported by the text, context, and legislative policy of the statute).

*Nabisco, Inc.*, 331 Or 178, 187, 11 P3d 1286 (2000). Although the statute "does not state explicitly the purpose" of an IME, in context, "the purpose is clear." *Id.* An IME is designed to provide the insurer and others involved in the claim process "with information about [the] claimant's condition from a doctor who has no fiduciary relationship with [the] claimant, such as that of an attending physician." *Id.* An insurer requesting an IME "might use the examining doctor's information" in resolving the claim, for example, "by challenging the continuing compensability of the injury[.]" *Id.*; *see also Darling v. Johnson Controls Battery Group*, 188 Or App 190, 204, 70 P3d 894 (2003) (stating that *Robinson*, "in broad terms," had "recognized the purpose of IMEs to be to protect [a self-ensured employer or insurer's] legal position on the claim, a purpose that readily encompasses [defense of] a denied claim that is being challenged via further review").

The statutory requirement to submit to an IME applies to "[a]ny worker entitled to receive compensation under this chapter." ORS 656.325(1)(a). The board and the Court of Appeals have broadly interpreted that provision as applying not only to a worker who has had their claim accepted but to any open claim, including one that the insurer denied.[7] *See Darling*, 188 Or App at 202 (noting that ORS 656.325(1)(a) authorizes IMEs "throughout the open period of a claim, not just the period before the denial and following acceptance"); OAR 436-010-0265(1)(b) ("The insurer may obtain three IMEs for each opening of the claim without authorization by the director. These IMEs may be obtained before or after claim closure."). Under that interpretation, an insurer may require a worker to submit to an IME after the insurer has sent a written notice of denial of the claim, as happened in this case.

ORS 656.325(1)(e) is the provision in the Workers' Compensation Law that governs a WRME and the resolution

---

[7] Generally, a claim is considered "open" until the claim is "closed" pursuant to ORS 656.268, though a closed claim can be reopened under ORS 656.265. *See* OAR 436-030-003 - 436-030-0580 (describing procedures for claim closure and reconsideration). When a worker makes a timely request for a hearing on an insurer's decision to deny the claim, the claim remains "open" until it is finally resolved through the hearing and appeals process. *See* ORS 656.283 (describing hearing rights and procedures); ORS 656.295 (board review of ALJ orders); ORS 656.295 (judicial review of board orders).

of this case hinges on our interpretation of that provision. Accordingly, we now examine its text and context in detail.

B.   *Text and Context of ORS 656.325(1)(e)*

ORS 656.325(1)(e) provides:

> "If the worker has made a timely *request for a hearing on a denial of compensability* as required by ORS 656.319 (1)(a) *that is based on one or more reports of examinations conducted pursuant to paragraph (a) of this subsection* and the worker's attending physician or nurse practitioner authorized to provide compensable medical services under ORS 656.245 does not concur with the report or reports, *the worker may request an examination* to be conducted by a physician selected by the director from the list described in ORS 656.328. The cost of the examination and the examination report shall be paid by the insurer or self-insured employer."

(Emphases added.) In this case, the parties agree that (1) Cardoza made a timely request for a hearing; (2) he then complied with SAIF's request for an IME; (3) the IME report supported SAIF's denial and became part of SAIF's "defense" of its denial decision, which it maintained throughout the claim process and at the hearing; (4) Cardoza's attending physician did not concur with the conclusion in the IME report; and (5) Cardoza then requested authorization for a WRME.

Thus, the only textual issue in dispute is whether Cardoza made a "request for a hearing" on a "denial of compensability" that was "based on" an IME report within the intended meaning of the statute. SAIF contends that the statute requires us to look at the grounds for denial at the time claimant requested a hearing. Because claimant requested a hearing on the "denial of compensability" in SAIF's written notice, SAIF contends that Cardoza was not entitled to a WRME because its written notice of denial and Cardoza's request for a hearing both occurred *before* SAIF requested an IME. Thus, according to SAIF, its denial was not and could not have been "based on" an IME report because the report did not exist when SAIF made its decision to deny the claim and when Cardoza requested a hearing on that denial. We disagree.

SAIF's interpretation is a plausible reading of the text of ORS 656.325(1)(e), but it is not the only plausible interpretation of that provision. An insurer's written notice of denial is a one-time event, while its "denial of compensability" decision continues throughout the time the claim is in dispute. As we have explained, an insurer's notice "is a key *procedural* component of the claim adjudication system." *Allen*, 320 Or at 213 (emphasis added). That notice "furnishes important information" that helps the parties "guide the dispute to the proper decision-making body within the compensation system, narrows the issues on which the parties must prepare for litigation, and expedites disposition of the claim through hearing or settlement." *Id.* at 214.

By contrast, a "denial of compensability" has substantive legal consequences that continue—and could change—until the claim is finally resolved. For example, we have indicated that an insurer's denial of compensability under the Workers' Compensation Law "*expressly* relieve[s] the insurer of the duty to pay most workers' compensation benefits." *Armstrong*, 328 Or at 161 (emphasis in original); *see also Darling*, 188 Or App at 198-99 (explaining that, under *Armstrong*, a denial of compensability relieves the insurer or self-insured employer "of the present duty to pay most workers' compensation benefits"). But that can change at any point in the claim administration process, as this court and the Court of Appeals have recognized.

In *Darling*, the Court of Appeals explained that a denial of compensability "does not extinguish the worker's *legal entitlement* to receive benefits; it instead suspends the *actual receipt* of most benefits and places the worker's entitlement in dispute." *Id.* (emphases in original). The denial thus "relieves the [self-insured employer or insurer] *only of the present duty* to pay most workers' compensation benefits." *Id.* (citing *Armstrong*, 328 Or at 161 (emphasis added)). The court further explained that, "until a worker's challenge to the denial is resolved, we cannot know as a general proposition whether the worker is entitled to those suspended benefits." *Id.* at 199.

Treating the benefits as "suspended" pending resolution of a disputed claim is consistent with our observation

in *Armstrong* that an injury is compensable "from the moment of its occurrence, even if the insurer denies that the injury is compensable[.]" 328 Or at 159. As we explained,

> "[i]f the insurer denies the employee's right to compensation, the statutes *expressly* relieve the insurer of the duty to pay most workers' compensation benefits. ORS 656.262(2). If the injury is determined to be compensable in the hearing and appeal process, the insurer is liable for all back benefits, interest, penalties, and attorney fees."

*Id*. at 161 (emphasis in original).

Thus, under the Workers' Compensation Law, an insurer's written notice of denial suspends the worker's receipt of benefits that the worker may eventually receive. When a worker requests a hearing after receiving that notice, those suspended benefits are in dispute and the claim remains open. The insurer can resolve the dispute by accepting the claim voluntarily or in a settlement, as we noted in *Allen*, 320 Or at 214. *See also* OAR 438-009-0005 (settlement stipulations); OAR 438-009-0010 (disputed claim settlements). If the insurer does not resolve the dispute by voluntarily accepting the claim or through settlement, and the injury is later determined to be compensable, then the insurer will be liable for all benefits that had been suspended, plus interest, penalties, and attorney fees, as we observed in *Armstrong*, 328 Or at 161.

Thus, an insurer's "denial of compensability" on an open claim continues as long as the claim remains open, and the denial decision can change at any point in the hearing and appeal process. The insurer's initial written notice is the procedural event that triggers that process and suspends the benefits that are in dispute, but the legal consequences of a denial of compensability that is in dispute are not resolved until the dispute is resolved. That suggests that an insurer's "denial of compensability" on an open claim continues and may be "based on" an IME report if an IME has been conducted and the insurer uses the resulting report to support its continued decision to deny that the claim is compensable.

SAIF contends that the statute's use of the present tense—a denial of compensability that "*is* based on" an

IME report—means that the statute was not intended to apply if the IME report did not exist when the insurer sent its notice of denial or when the worker requested a hearing challenging that denial. *See Brownstone Homes Condo. Assn. v. Brownstone Forest Hts.*, 358 Or 223, 232, 363 P3d 467 (2015) (citing several cases for the proposition that "the use of a particular verb tense in a statute can be a significant indicator of the legislature's intention" (internal quotation marks and brackets omitted)). However, as petitioner points out, the statute's use of "is" in the present tense can plausibly be understood to mean that a denial "is based on" an IME report whenever the insurer uses an IME report to defend its continued denial of an open claim at any point in the claim resolution process, not just when the insurer mails notice of its initial decision.

SAIF further contends that the statutory scheme and its implementing administrative rules reflect a "temporal relationship" between the existence of an IME report and the insurer's notice of denial that compels SAIF's interpretation. But that "temporal relationship" is not as clearly defined as SAIF suggests.

Under ORS 656.325(1)(e), a worker "may request" a WRME if the worker has made a timely "request for a hearing" on an insurer's "denial of compensability" that "is based on" on IME report. One way to read that provision is to connect the grounds for an insurer's "denial of compensability" temporally to the worker's "request for a hearing," as SAIF contends.[8] But the statute's text can plausibly be read to require a WRME if all three conditions exist, regardless of the order in which they come into existence. That reading is consistent with the context that shows how a worker's request for a WRME fits within the process for resolving a disputed claim.

---

[8] The dissenting opinion connects the "denial of compensability" in ORS 656.325(1)(e) to the "mailing of the denial" in ORS 656.319(1)(a) because ORS 656.325(1)(e) expressly refers to ORS 656.319(1)(a). 374 Or at 292-93 (Garrett, J., dissenting). That is one way to read those provisions, but not the only way. ORS 656.319(1) specifies the *time limitations* that apply to a request for a hearing. Thus, the reference in ORS 656.325(1)(e) to a worker's "timely request for a hearing on a denial of compensability *as required by ORS 656.319(1)(a)*" could just be a reference to the statute that specifies when the request for a hearing must be filed to be considered timely. (Emphases added.)

As explained above, an insurer's "denial of compensability" of an open claim can change as the claim progresses through the appeal and hearing process, potentially affecting whether the insurer's decision remains a denial or whether a WRME—or a hearing—is needed at all. For example, an insurer that requested an IME after sending a notice of denial *could* decide to accept the claim based on the IME report. If that occurred, there would be no reason for a WRME because there would not be a denial at all, nor would there be a hearing on the worker's claim.

Another possibility is that the basis for denying the claim could be sufficiently strengthened by the IME report that the worker decides to withdraw the request for a hearing. If that occurred, there would be no reason for a WRME even though the denial decision has not changed because there would be no pending request for a hearing. And if the insurer decided after receiving the IME report and the worker's request for a WRME that it did not need the IME report to support its denial decision or did not want to pay for a WRME, the insurer could disclaim any intent to use the IME report to support its continued denial of the claim. If that occurred, there would still be a hearing, but the worker would not be entitled to a WRME because the insurer's denial decision at that point would not be "based on" the IME report.

Those possibilities suggest that a worker is entitled to a WRME on an open claim if there is a temporal coinciding of a pending hearing request, an IME report that is disputed by the worker's attending physician, the insurer's use of that report to support its continued denial of compensability, and the worker's request for a WRME.[9] In this case, it is undisputed that, at the time of Cardoza's request for a WRME, Cardoza's request for a hearing was pending, there was an IME report that was disputed by Cardoza's attending physician, and the IME report supported SAIF's continued denial of the claim. SAIF confirmed, when it opposed

[9] We note that the text of ORS 656.325(1)(e) says that the worker "may request" a WRME; it says nothing about whether that request must be granted. However, the text also requires the insurer to *pay* for the WRME and the examination report. That certainly implies that, if the worker satisfied the conditions in ORS 656.325(1)(e) for requesting a WRME, the worker is entitled to a WRME and a report of that examination, and SAIF does not contend otherwise.

Cardoza's request, that it intended to use that report at the hearing to support its continued denial of the claim. It follows that, when Cardoza's request was denied, SAIF's denial of compensability was "based on" an IME report within the intended meaning of ORS 656.325(1)(e).

SAIF's contrary interpretation would mean that a "denial of compensability" could be supported by an IME report written by a physician selected by the insurer, and a worker's right to access a WRME to contest the IME report would depend entirely upon whether the IME request came before or after the insurer's notice of denial. That interpretation would be inconsistent with the policies underlying Oregon's Workers' Compensation Law. *See* ORS 656.012 (2)(b) (stating that one objective of the law was to provide "a fair and just administrative system for delivery of medical and financial benefits to injured workers"); ORS 656.012(3) (declaring that the provisions of the Workers' Compensation Law "shall be interpreted and understood in an impartial and balanced manner").

Denying a worker the opportunity to get a medical examination that the worker could use to contest the insurer's IME report based solely on the timing of the insurer's IME request seems to favor the insurer. And a decision-making process that relies on an IME report prepared by a doctor selected by the insurer, and disputed by the worker's doctor, without allowing another medical examination at the worker's request by a doctor approved by the board, does not seem to be very impartial and balanced. And, as we explain next, the legislative history demonstrates that making the process fairer and more balanced and impartial is exactly what the legislature intended when it enacted ORS 656.325(1)(e).

C.  *Legislative History of ORS 656.325(1)(e)*

ORS 656.325(1)(e), formerly ORS 656.325(1)(b), was enacted in 2001 through a provision in Senate Bill (SB) 485 with the support of a Management Labor Advisory Committee (MLAC). Or Laws 2001, ch 865, § 13.[10] John Shilts,

---

[10]  As originally enacted, ORS 656.325(1)(b) (2001) provided:

"If the worker has made a timely request for a hearing on a denial of compensability as required by ORS 656.319(1)(a) that is based on one or more reports of examinations conducted pursuant to paragraph (a) of this

then-administrator of the Workers' Compensation Division of the Department of Consumer and Business Services (DCBS), explained that the purpose of that provision in SB 485 was "to provide for more worker input regarding the choice of IME providers" and "introduce[] a level of choice for the worker that ha[d] not existed previously." Exhibit A, Senate Committee on Business, Labor and Economic Development, SB 485, Jan 31, 2001 (written testimony of John Shilts).

Consistent with that goal, under SB 485 as originally proposed, if an insurer or self-insured employer required a worker to submit to an IME, the worker—not the insurer—would choose the IME provider from a group of three physicians that had been qualified by DCBS. SB 485, A-Engrossed (Jan 25, 2001); *see also* Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Jan 31, 2001, Tape 14, Side A (testimony of John Shilts). Several witnesses criticized that proposal as adding unnecessary administrative complications.[11] Some witnesses who opposed the bill as originally proposed

---

subsection and the worker's attending physician does not concur with the report or reports, the worker may request an examination to be conducted by a physician selected by the director from the list described in 656.268 (7)(d). The cost of the examination and the examination report shall be paid by the insurer or self-insured employer."

That paragraph was renumbered as ORS 656.325(1)(e) in 2005. The only substantive change that is reflected in the current version of ORS 656.325(1)(e) is the inclusion of nurse practitioners among those professionals whose opinion a worker can rely upon to establish a lack of concurrence with an IME.

[11] For example, James Johnson, then-city manager for the City of Eugene, testified that the provision would cause "an increased administrative burden" for insurers and employers without creating tangible benefits for workers. Exhibit B, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 2, 2001 (written testimony of James Johnson). Joe Gilliam of the Oregon Grocery Industry Association asserted that the change would not improve the workers' compensation system and instead would "complicate it for all parties." Exhibit H, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 2, 2001 (written testimony of Joe Gilliam). Hasina Squires of the Special Districts Association of Oregon described it as "a solution looking for a problem," considering that "[n]o one benefits from biased medical opinions[.]" Exhibit J, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 2, 2001 (written testimony of Hasina Squires). Ken Hector, the supervisor of workers' compensation for a local company, discounted the presumed concern about anti-worker bias among physicians who conduct IMEs. He explained that the IME physician often concurs with the treating physician; that the ALJ typically gives the treating physician's opinion more weight; and that the ALJ is likely to give "zero credibility" to an IME physician that makes the same medical findings regardless of the case. Tape Recording, Senate Committee on Business, Labor

nevertheless acknowledged worker concerns about bias in the existing IME process. For example, Mike Crew of the Oregon Medical Association acknowledged the concern that "insurance companies were somehow using physicians that had some preconceived notion or bias toward the party who's paying the bill." Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 2, 2001, Tape 18, Side A (testimony of Mike Crew).

In response to those concerns, Representative Kevin Mannix—testifying in his personal capacity—proposed an alternative that the legislature ultimately adopted. Mannix acknowledged that "workers want to see a little more balance" in the IME process and that "they feel that the IME process is kind of loaded against them and is used against them in litigation." Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 2, 2001, Tape 17, Side A (testimony of Kevin Mannix).[12] Mannix then proposed this solution:

> "*Where there is an IME, and there is a denial, and the worker requests a hearing on the denial, allow the worker to have access to the very same medical arbiter panel that we have right now*, and allow the worker an exam with a panel equivalent to whatever that IME panel was, at the cost of the employer insurer. In other words, you take the current medical arbitration process and expand it and say, '*If the worker's at risk in litigation and there's an IME, give the worker a medical arbiter exam.*' You no longer have to get into the whole issue of relationships between employers and insurers and IME providers and all of that. You use an existing system, and still, the employer insurer pays for it."

*Id.* (emphases added). As so described, Mannix's proposal was not intended to give a worker access to an additional medical examination to contest an IME report *only if* the IME report existed before an insurer's written notice of denial. Rather, all that was required was the existence of an IME report

---

and Economic Development, SB 485, Feb 2, 2001, Tape 18, Side B (testimony of Ken Hector).

[12] Mannix did not agree with the perception that the IME process was "kind of loaded" against workers, stating that "85 percent of claims are accepted," and that, "in many of those cases, you had an IME that agreed with the attending physician." Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 2, 2001, Tape 17, Side A (testimony of Kevin Mannix).

supporting the insurer's decision when the worker was "at risk in litigation." The wording of Mannix's proposed amendment was one of many proposed amendments that was considered by the MLAC and one of the amendments that was eventually approved by the MLAC and the legislature, but there is no clear evidence in the legislative history about how that amendment was intended to work, other than Mannix's testimony when he initially proposed it to the legislature.[13]

A summary of Mannix's proposed amendment, as presented to the Senate committee, articulated the approach as follows:

> "Amend the statute as follows: retain the insurer's authority to select IMEs, as they currently do, but allow a worker to request examination by a medical arbiter selected by the director if:
>
> "the worker has timely requested a hearing on a denial[;]
>
> "where that denial is based upon one or more IME reports obtained by an insurer or self-insured employer[;] and
>
> "the worker's attending physician does not concur with those reports."

[13] On February 2, 2001, Mannix stated that he had "just presented" his proposed amendment to the MLAC. Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 2, 2001, Tape 17, Side A (testimony of Kevin Mannix). During a subsequent work session on SB 485 on February 14, 2001, Shilts provided an update on the MLAC's deliberations. He explained that the MLAC had been provided with "dozens of amendment suggestions on the bill" and had "gone through an initial analysis of the amendments, many of which were brought forward in front of the committee during the last public hearing [held on February 2]." Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 14, 2001, Tape 26, Side A (testimony of John Shilts). The committee chair, Senator Roger Beyer, informed the rest of the committee that they would return to SB 485 a week later with the hope that "MLAC [would] be done with [the amendments] by then." *Id.* The committee did not discuss any of the proposed amendments to SB 485 at the February 14 work session.

At the next work session on February 21, Senator Beyer began by describing "a rough draft of amendments accepted by MLAC." Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 21, 2001, Tape 33, Side B (statements of Senator Beyer). That "rough draft" was a document titled "Amendments Accepted by the Management-Labor Advisory Committee." Exhibit B, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 21, 2001. Senator Steve Harper referred to that document as the MLAC's "proposed solutions" to the issues that had been presented to both committees. Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 21, 2001, Tape 32, Side B (statements of Senator Harper). One of those "proposed solutions" was the amendment that Mannix had proposed on February 2.

Exhibit B, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 21, 2001 (written testimony of John Shilts). Shilts described the proposal as "a three-level test that'll allow a worker to get examined by an impartial examiner, which was the point of the original proposal, without interfering with insurers' rights to select independent medical examiners." Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 21, 2001, Tape 32, Side B (testimony of John Shilts). Nothing in the legislative history suggests that the legislature changed its fundamental objective—to address workers' concerns that the existing IME process was biased—when it adopted Mannix's amendment.

When SB 485 reached the House, Shilts again explained the function and purpose of that provision in the bill.[14] In describing what that provision would do, he stated that it "allows workers who are litigating a denial that is based on an IME to request an examination from the arbiter list." Exhibit L, House Committee on Business, Labor and Consumer Affairs, SB 485, May 15, 2001 (written testimony of John Shilts). He explained that the provision was intended to "provide for an impartial examination for workers in litigation." *Id*.

Jim Egan—testifying in his capacity as the President of the Workers' Compensation section of the Oregon Trial Lawyers Association in support of SB 485, as amended—stated that the provision "allows an exam by a physician appointed by the department when a compelled medical examination and attending physician's report do not agree." Tape Recording, House Committee on Rules, Redistricting, and Public Affairs, SB 485A, June 15, 2001, Tape 150, Side B (testimony of Jim Egan). Tim Nesbitt, then-President of the Oregon AFL-CIO, testified that the

---

[14] The provision in SB 485 that gave workers a right to request a WRME was only one of many changes to the Workers' Compensation Law made when the legislature enacted the bill. The Legislative Fiscal Office's fiscal analysis of SB 485 estimated that the bill would impact the Workers' Benefit Fund in seven major ways, resulting in an estimated $2.6 million to $8.6 million in increased payments from the fund. The fiscal analysis did not identify the cost of additional IMEs or WRMEs as one of the seven major fiscal impacts of the bill, nor did it give any specific estimate of the fiscal impact of the provision that gave workers a right to request a WRME.

bill would "provide new oversight over the use of compelled medical exams by insurance companies" by "giving workers the right to refer adverse determinations by insurance medical examiners (IMEs) to an independent medical arbiter for a second opinion." Exhibit E, House Committee on Business, Labor and Consumer Affairs, SB 485A, June 15, 2001 (written testimony of Tim Nesbitt, President, Oregon AFL-CIO). No witness or legislator indicated that a worker's requested medical examination would be allowed only if the insurer had received the disputed IME report *before* sending the worker a written notice of denial.[15]

In sum, the legislative history demonstrates that, from the outset of the legislative process, the intended purpose of the provision in SB 485 that authorized a medical examination requested by the worker was to reduce perceived or actual bias in the existing IME process. Although the mechanism for doing so changed as the bill progressed, the intended purpose never changed. The bill as enacted was intended to meet that purpose by allowing workers to get "a second opinion" when the claim is "in litigation." Thus, the legislative history supports the conclusion that a worker is entitled to a WRME when the denial of the worker's claim is in litigation, the insurer uses one or more IME reports to support its denial, and the worker's attending physician or nurse practitioner does not concur with the IME reports.

Nothing in the legislative history suggests that the legislature specifically intended that a worker would be entitled to a WRME only if the insurer had received the disputed IME report before sending the worker a written notice denying that the claim was compensable.[16] To the contrary,

---

[15] Petitioner contends that legislative testimony demonstrates that SB 485 was intended to give "equal dignity" to the worker-requested and insurer-requested examination reports. But we understand that testimony to refer to giving "equal dignity" to the number and types of physicians involved in each examination, not to the worker's right to request a medical examination in the first place. *See* Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Mar 14, 2001, Tape 50, Side A (testimony of Jerry Keene) (stating that, "if the insurer obtained a panel exam involving two or three different doctors, the worker is entitled to have an examination of equal dignity, of equal type").

[16] The dissenting opinion suggests that the lack of any statement in the legislative history that the *initial* denial must be based on an IME for a worker to qualify for a WRME is understandable, because the wording of the bill was developed by MLAC, and "everyone involved in the development of the bill" understood

by the time the bill reached the House, late in the legislative process, the legislative history indicates that the bill as amended was intended to address perceived bias in the IME process by giving the worker the right to an "impartial" examination whenever the insurer's continued denial of the worker's claim was in litigation.

### III.   CONCLUSION

We conclude from the text, context, and legislative history of ORS 656.325(1)(e) that we must look to the claim status at the time that a worker's request for a WRME is decided to determine whether the insurer's denial of compensability was "based on" an IME report. Here, SAIF required Cardoza to submit to an IME and obtained a report, claimant had requested a hearing to contest SAIF's continuing denial of the claim, and SAIF used the IME report to support its continued denial that Cardoza's claim was compensable. Thus, the board erred in concluding that SAIF's "denial of compensability" was not "based on" an IME report, and accordingly erred in holding that Cardoza was not entitled under ORS 656.325(1)(e) to a WRME to contest that denial.

The decision of the Court of Appeals is affirmed. The order of the Workers' Compensation Board is reversed, and the case is remanded to the board for further proceedings.

**GARRETT, J.,** dissenting.

When an insurer or self-insured employer has denied compensability based on a medical examination of the claimant (IME), ORS 656.325(1)(e) entitles the claimant to

---

that that was the intent. 374 Or at 296-97 (Garrett, J., dissenting). But, as noted above, 374 Or at 288 n 13, the precise wording of the Mannix amendment to the bill was one of "dozens of amendments" that MLAC addressed between February 2—when the amendment was first proposed—and February 21, when the wording was presented to the legislative committee. There is no evidence that "everyone" understood the intent behind all the amendments under consideration during that stage of the legislative process. The dissent also suggests that "it would hardly be surprising" if the wording was a "compromise" that was intended to give workers a right to a WRME in more limited circumstances. *Id.* at 296-97 (Garrett, J., dissenting). That is speculation; there is no evidence in the legislative history that such a compromise was specifically intended. Moreover, statements by Mannix and others during the legislative process show that the intent was to give the worker a right to a WRME to contest an IME whenever the worker's physician disagreed with the IME report, and the dispute would be resolved "in litigation."

request her own examination (referred to here as a "worker requested medical exam," or "WRME") at the insurer's or employer's expense. In this case, SAIF denied compensability without conducting any medical exam. Claimant made a timely request for a hearing. Before the hearing, SAIF required claimant to submit to an IME, which SAIF then used as evidence to support its denial decision. The majority concludes that, once SAIF obtained an IME and stated its intention to rely on it at the hearing, the denial became "based on" that IME for purposes of ORS 656.325(1)(e), so that claimant was then entitled to a WRME, regardless of why the claim was denied in the first place. 374 Or at 291.

In my view, the majority's conclusion is contrary to the statute. ORS 656.325(1)(e) provides:

> "If the worker has made a timely request for a hearing on a denial of compensability as required by ORS 656.319 (1)(a) that is based on one or more reports of examinations conducted pursuant to paragraph (a) of this subsection and the worker's attending physician or nurse practitioner authorized to provide compensable medical services under ORS 656.245 does not concur with the report or reports, the worker may request an examination to be conducted by a physician selected by the director from the list described in ORS 656.328. The cost of the examination and the examination report shall be paid by the insurer or self-insured employer."

The question is whether, under that provision, a denial of compensability "is based on" an IME that occurs *after* the insurer or employer informs the claimant that the claim has been denied. The majority reasons that "denial" is a status that exists throughout the claim resolution process, and that a denial consequently may be "based on" different evidence at different times. 374 Or at 282. Therefore, a denial that was initially "based on" nonmedical reasons may later come to be based on an IME if it lends support to the denial.

Although the majority may be correct that "denial" can, in some contexts, be understood as a status that exists over time, that does not appear to be how the legislature used the word in ORS 656.325(1)(e). That statute contemplates that a "denial" means the decision to deny the claim,

with the corresponding notice to the claimant stating the basis for that decision.

That interpretation is evident from other textual clues in the statute. First, for the entitlement to an WRME to be triggered, the worker must have "made a timely request for a hearing on a denial of compensability." The reference to requesting "a hearing on" a denial suggests that a denial is an *event*; something must have occurred that causes a claimant to request a hearing. Second, the statute expressly refers to ORS 656.319(1)(a), which, as pertinent here, provides:

"(1)   With respect to objection by a claimant to denial of a claim for compensation under ORS 656.262 [processing of claims and payment of compensation], a hearing thereon shall not be granted and the claim shall not be enforceable unless:

"(a)   A request for hearing is filed not later than the 60th day after the mailing of the denial to the claimant; or

"(b)   The request is filed not later than the 180th day after mailing of the denial and the claimant establishes at a hearing that there was good cause for failure to file the request by the 60th day after mailing of the denial."

ORS 656.319(1). What is notable about that statute, for present purposes, is that it refers three different times to "mailing of the denial." Thus, regardless of the majority's point that "denial" may, in some other contexts, describe a status that exists over time, that is not the way the legislature has used the word in ORS 656.319(1). In that statute, "denial" obviously refers to the notice sent to the claimant that the claim has been denied.

Accordingly, reading the two statutes together, I would conclude that the legislature intended for "denial of compensability" in ORS 656.325(1)(e) to mean the action taken by the insurer or self-insured employer to notify the claimant that the claim has been denied, which triggers the claimant's statutory obligation in ORS 656.319(1) to request a hearing within a specified time period. It follows that *that* action—the initial denial decision—is the subject of the statute's requirement that the denial must be "based

on" the IME in order for the claimant to have a statutory entitlement to a WRME.

The majority contends that, as a matter of syntax, the phrase "is based on" can be understood to refer to evidence that post-dates the initial denial. 374 Or at 283. Perhaps, but that does not explain why the legislature chose to qualify the WRME entitlement by linking it to a claimant's request for a hearing on a denial of compensability—and by expressly referring to ORS 656.319(1)(a), which refers to the *notice of denial* as the event that starts the clock for requesting that hearing. If the legislature had intended for the initial basis for a denial to be irrelevant to the entitlement to a WRME—that is, if the legislature had intended that a claimant could obtain a WRME whenever an insurer or employer obtains an IME, regardless of timing—the legislature could easily have said so. For example, ORS 656.325(1)(e) could instead have provided:

"**If, at any point, the insurer or self-insured employer requires the claimant to submit to a** medical examination conducted pursuant to paragraph (a) of this subsection and the worker's attending physician or nurse practitioner authorized to provide compensable medical services under ORS 656.245 does not concur with the report or reports, the worker may request an examination to be conducted by a physician selected by the director from the list described in ORS 656.328."

Or, the legislature could have provided that, whenever an insurer or self-insured employer "relies on" or "intends to rely on" an IME to support a denial, then the claimant is entitled to a WRME. In their simplicity, those various alternatives stand in marked contrast to the wording the legislature actually chose: "If the worker has made a timely request for a hearing on a denial of compensability as required by ORS 656.319(1)(a) that is based on one or more reports of examinations conducted pursuant to paragraph (a) of this subsection ***[.]" The reference to ORS 656.319(1)(a), which explains that a hearing must be requested after a "denial" is "mailed" to the claimant, must be presumed to have significance. It is a clear indication that, in linking the entitlement to a WRME to the basis for a "denial of compensability," the

legislature was contemplating the basis for the denial *when issued*.[1]

Nothing in the legislative history cited by the majority leads to a different conclusion. And the legislative history includes additional evidence not cited by the majority that is consistent with the natural reading of the text.

The majority points to statements by legislators and witnesses to the effect that the purpose of the WRME provision was to "reduce perceived or actual bias in the existing IME process. * * * The bill as enacted was intended to meet that purpose by allowing workers to get 'a second opinion' when the claim is 'in litigation.'" 374 Or at 290. But that general statement of purpose sheds no real light on the interpretive question here. It is undisputed that the legislature created an entitlement to a WRME in ORS 656.325(1)(e) to advance the policy objective described by the majority. At issue is the scope of that entitlement. Claimant's interpretation and SAIF's interpretation both are consistent with the majority's description of the statute's purpose; SAIF's interpretation simply furthers the policy in a more limited way by tying the entitlement to a WRME to the basis for the initial denial. The majority appears to assume that, because of that limitation, SAIF's interpretation is less consistent with the legislature's purpose. But that assumption is unjustified.

The legislature frequently chooses to pursue an identified purpose without pursuing it to the maximum possible extent. As this court has observed, bills often result from "'the accommodation of competing and mutually inconsistent values.' Many bills contain both provisions that advance their principal purposes and provisions that may limit their pursuit of those goals to protect other interests." *State v. Uroza-Zuniga*, 364 Or 682, 692-93, 439 P3d 973

---

[1] It is worth noting that, under ORS 656.262(11)(a), insurers are subject to penalties as well as attorney fees for unreasonably denying claims. The Court of Appeals has held that the reasonableness of a denial is evaluated in light of the evidence available when the initial denial decision is made. *Brown v. Argonaut Insurance Company*, 93 Or App 588, 591, 763 P2d 408 (1988). The effect is that insurers have an incentive to request an IME before making a decision on the claim if they have reason to think that medical evidence would be needed to justify a denial. An insurer who acted otherwise in the hope of avoiding the expense of a WRME would be acting at its peril.

(2019) (quoting Hans A. Linde, *Due Process of Lawmaking*, 55 Neb L Rev 197, 212 (1976)). Thus, the text of a statute may reflect an accommodation of competing interests, and that compromise may be a political prerequisite for—or even the driving political reason behind—the bill's passage. In such a case, a court should be particularly mindful that the most natural reading of the text likely also reflects the considered understanding of those who drafted the bill and the intent of legislators who wished to effectuate the compromise.

As the majority recounts, Senate Bill (SB) 485, the 2001 bill that led to the enactment of ORS 656.325(1)(e), developed through the Management Labor Advisory Committee (MLAC). 374 Or at 285. MLAC was created by the 1990 legislation that substantially overhauled Oregon's workers' compensation system. *See, e.g.*, *Brown v. SAIF*, 361 Or 241, 391 P3d 773 (2017) (discussing enactment history). Since 1990, MLAC, which comprises representatives from management and labor, has exercised what is effectively a gatekeeping role concerning legislative concepts that would affect the workers' compensation system, ensuring that adequate consideration is given to stakeholder interests. In that capacity, MLAC proposes legislation of its own and advises on legislative concepts proposed by others.[2]

Because SB 485 was proposed through MLAC, we may presume that people with expertise representing both labor and management interests were involved in its development. That matters for two reasons. First, accepting as a premise that the goal of the proposal was to benefit one set of MLAC stakeholders—workers—by giving them more access to employer-paid medical exams, everyone involved would have understood that the proposal would come at a cost to the other MLAC stakeholders—insurers and employers. In light of that, it would hardly be surprising if the product of discussions within MLAC was a compromise—an "accommodation" of those competing interests, *Uroza-Zuniga*, 364 Or at 692—that provided for WRMEs in some but not all cases.

---

[2] For background, see https://www.oregon.gov/dcbs/mlac/pages/index.aspx (accessed Sept 17, 2025).

Second, the fact that the bill was developed through MLAC helps explain what the majority sees as a puzzling omission: During the legislative process, no one apparently made it clear that the *initial* denial must be based on an IME. 374 Or at 290. But, if everyone involved in the development of the bill had a shared understanding of what the text meant, the silence on that point is much less surprising; they may just have taken it for granted that the text means what it appears to say. Those well versed in the workers' compensation system would have understood that, by expressly connecting the WRME entitlement in ORS 656.325(1)(e) to the notice of denial referenced in ORS 656.319(1), the bill contemplated that the initial denial must have been based on an IME. Nor is there any basis in the legislative history for supposing that legislators had a different understanding or intended to do anything different than what MLAC proposed.

The legislative history includes several pieces of evidence that support that understanding. As the majority notes, the entitlement to a WRME was not in the original version of SB 485, and was proposed later by Kevin Mannix. 374 Or at 287. Mannix presented his idea to a legislative committee, explaining:

> "I think the solution is simple. Where there is an IME and there is a denial and the worker requests a hearing on the denial, [the amendment would] allow the worker to have access to the very same medical arbiter panels that we have right now and allow the worker an exam with a panel equivalent to whatever that IME panel was at the cost of the employer or insurer."

Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 2, 2001, Tape 17, Side A (statement of Kevin Mannix). Mannix's testimony reflects an understanding that events would occur in a particular sequence: an IME would be conducted, followed by a denial, followed by a request for hearing.

A few days later, the Mannix proposal was presented to MLAC with the following description:

> "Kevin Mannix, Attorney: proposes amending the bill to provide for a WCD-arranged, insurer-paid exam for injured

workers when an insurer or self-insured employer denies a claim based on the findings of an insurer-arranged IME which becomes the issue in a compensability suit."

Minutes, Workers' Compensation MLAC Committee, SB 485—Workers' Comp Reform, Feb 5, 2001 (statement of WCD Administrator John Shilts). MLAC proposed its own amendments to the Mannix proposal, which then came back before the Senate committee for consideration. That committee heard testimony from appellate lawyer and workers' compensation specialist Jerry Keene, who testified as follows:

"Section 13, worker arbiter exams. The statute premises a request on the timely filing of a request for hearing of *a compensability denial that was based on the IME*. * * *

"And also it was discussed that one of the conditions is that the attending physician of the worker not have concurred with the insurer's IME. That isn't fleshed out. There was a sense that what that meant was that if the doctor disagreed in part or with all of it, that it didn't have to be a total disagreement before the worker is entitled. It could be a partial disagreement, but that the disagreement by the attending physician had to be *on the medical reason that was offered by the IME doctor that was the basis for the denial*."

Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Mar 14, 2001, Tape 50, Side A (statement of Jerry Keene) (emphases added). Keene's testimony is notable in that it refers to a denial that "was" based on an IME, even though the statutory text used the phrase "is based on." That indicates that, to practitioners familiar with the subject matter, there may have been no meaningful difference in referring to a "denial that is based on" an IME and a "denial that was based on" an IME.

To be sure, none of those excerpts is definitive. But they are certainly consistent with an interpretation that, in the view of MLAC and legislators, the WRME entitlement would be triggered by an *initial* denial of compensability based on an IME, as a straightforward reading of the text of ORS 656.325(1)(e) would suggest. The majority does not identify any legislative history that clearly suggests a different understanding.

The best evidence of how the legislature chose to give effect to its stated purpose is, of course, the text that it chose to enact. As discussed above, the text of ORS 656.325(1)(e) directs the reader's focus to the "denial" that triggers the claimant's deadline for requesting a "hearing" under ORS 656.319(1), to which ORS 656.325(1)(e) expressly refers. In that context, "denial" means the notice that informs the claimant of the basis for denial of compensability. Because the majority concludes otherwise, I respectfully dissent.

DeHoog, J., joins in this dissenting opinion.